Robert L. DOWELL, et al., Plaintiffs,

v.

The BOARD OF EDUCATION OF the OKLAHOMA CITY PUBLIC SCHOOLS, Independent District No. 89, et al., Defendants.

No. CIV–61–9452–B.

United States District Court, W.D. Oklahoma.

Nov. 7, 1991.

Norman J. Chachkin, NAACP Legal Defense Fund, New York City, John W. Walker of John W. Walker, P.A., Little Rock, Ark., Lewis Barber, Jr. of Barber & Marshall, P.A., Oklahoma City, Okl., and Janell M. Byrd, Washington, D.C., for plaintiffs.

Charles J. Cooper, Peter J. Ferrara, Ellen M. Jakovic, and Michael W. Kirk of Shaw, Pittman, Potts & Trowbridge, Washington, D.C., and Laurie W. Jones of Fenton, Fenton, Smith, Reneau & Moon, of counsel, Oklahoma City, Okl., for defendants.

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| I. | PROCEDURAL HISTORY | 1149 |
| II. | THE INJUNCTION SHOULD BE DISSOLVED BECAUSE THE SCHOOL BOARD HAS COMPLIED IN GOOD FAITH WITH ITS TERMS AND THE VESTIGES OF PRIOR SEGREGATION HAVE BEEN ELIMINATED TO THE EXTENT PRACTICABLE | 1156 |
| | A. The Oklahoma City School Board Has in Good Faith Fully Implemented and Complied with the Court's 1972 Decree, and is Not Likely to Return to a System of *De Jure* Segregation | 1156 |
| | B. The Vestiges of Prior *De Jure* School Segregation had been Eliminated to the Extent Practicable by 1985, When the SRP was Adopted | 1160 |

| | | Page |
|---|---|---|
| 1. | Residential Segregation | 1160 |
| 2. | Student Assignments | 1172 |
| 3. | Faculty | 1175 |
| 4. | Administrative Staff | 1177 |
| 5. | Transportation | 1177 |
| 6. | Extra-curricular Activities | 1177 |
| 7. | Facilities | 1178 |
| 8. | Conclusion | 1178 |

III. THE SRP WAS ADOPTED FOR LEGITIMATE, NON–DISCRIMINATORY PURPOSES AND THEREFORE SATISFIES EQUAL PROTECTION REQUIREMENTS ... 1179

A. The Board Adopted the SRP to Remedy Inequities in the Finger Plan and not for Any Discriminatory Purpose ... 1180

| 1. | Operation of the Finger Plan and Adoption of the SRP | 1181 |
| 2. | Motivation Behind Adoption of the SRP | 1183 |
| 3. | Procedure for Adoption of the SRP | 1184 |
| 4. | Testimony Concerning Intent | 1185 |

B. The Board Adopted the SRP for Additional Non–Discriminatory Reasons Related to the Expected Benefits of a Neighborhood Schools Plan ... 1187

| 1. | Parental Involvement | 1187 |
| 2. | Community Involvement | 1189 |
| 3. | Programs to Maintain Unitary School System | 1189 |
| 4. | Educational and Extracurricular Programs | 1190 |
| 5. | Negative Effects of Busing | 1191 |

C. The Emergence of Predominantly Black Schools Under the SRP, Without More, Does Not Establish that the Board Acted with Discriminatory Intent 1191

IV. CONCLUSION ... 1195

V. SUMMARY OF FINDINGS ... 1196

## MEMORANDUM OPINION

BOHANON, District Judge.

The central issue now before this court was aptly framed by the ninth circuit in a closely analogous case decided over a decade ago. " 'If not now, and on this showing, when, and on what showing' will the governance of the school system be restored to the elected officials who are charged with that governance under state law?" *Spangler v. Pasadena City Bd. of Educ.*, 611 F.2d 1239, 1240 (9th Cir.1979). Plaintiffs' answer to this question is direct: not in the foreseeable future, and perhaps never. Defendant's answer to this question is equally direct: now is the time.

This October was the thirtieth anniversary of this case, which was filed in this court in October, 1961. During this time, the court and the parties have labored together on the difficult and sensitive task of dismantling a formerly *de jure* segregated school district and establishing in its place a unitary, nondiscriminatory system. After 30 years of litigation, this case is now ready for final resolution. The Supreme Court has remanded the case back to this court with instructions to determine on the basis of the established record whether the purpose of the comprehensive desegregation plan entered by the court in 1972 had been achieved as of 1985. The court finds that the record in this case, measured against the standards set forth in the Supreme Court's opinion, clearly establishes that the defendant Oklahoma City Board of Education ("Board") had eradicated the vestiges of the dual system and was entitled to have the desegregation decree dissolved as of 1985. Accordingly, the court, again, dissolves that decree. The court also finds that the Student Reassignment Plan ("SRP") implemented in 1985 satisfies the applicable equal protection standards and therefore was within the Board's authority to adopt. The court consequently dismisses this case.

## I. PROCEDURAL HISTORY

In July, 1963, this court found that the Board had intentionally segregated the schools by race. *Dowell v. School Board,* 219 F.Supp. 427 (W.D.Okla.1963). After several years of additional litigation over various remedial efforts, this Court in 1972 entered a decree imposing a comprehensive school desegregation plan—the "Finger Plan"—that "was designed not only to assist the Board in satisfying its affirmative desegregation obligation, but also to allow the school district to achieve the ultimate goal—unitary status." *Dowell v. Board of Educ.,* No. Civ. 61–9452 (W.D.Okla., Jan. 18, 1977); *Board of Educ. v. Dowell,* — U.S. ——, 111 S.Ct. 630, 633–34, 112 L.Ed.2d 715 (1991).

In 1977, the School Board moved this court to close the case. After notice and a hearing, the court declared the Oklahoma City school system to be "unitary" and terminated its jurisdiction over the case. The court did not, however, formally dissolve the injunctive decree entered in 1972. The court's order was not appealed.

In 1985, the Board adopted the SRP, which eliminated busing for students in grades 1–4 and assigned those students to their neighborhood elementary schools. Plaintiff moved to "reopen" the case, contending that the school district was not unitary and that the elimination of busing would create ten elementary schools that were at least 90 percent black. After a two-day hearing, this court denied Plaintiffs' motion, ruling that its 1977 finding of unitariness was *res judicata* and that the neighborhood school plan was, in any event, constitutional. *Dowell v. Board of Educ.,* 606 F.Supp. 1548 (W.D.Okla.1985).

The tenth circuit reversed, holding that this court's 1977 order terminating jurisdiction, while binding on the parties, did not formally dissolve the 1972 injunction. The court of appeals remanded the case for further proceedings to determine whether the 1972 injunction should be lifted or otherwise modified to permit the Board to adopt the SRP. *Dowell v. Board of Educ.,* 795 F.2d 1516, 1523 (10th Cir.), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986).

In June 1987, this court held an eight-day evidentiary hearing in which it received, in the tenth circuit's words, "a golconda of testimony and exhibits." *Dowell v. Board of Educ.,* 890 F.2d 1483, 1487 (10th Cir. 1989). Relying on the Supreme Court's decision in *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), this court concluded that the question whether the 1972 decree should be dissolved depended upon "whether the 'purposes of the litigation,' as incorporated in the 1972 desegregation decree, have been fully achieved." *Dowell v. Board of Educ.,* 677 F.Supp. 1503 at 1520 (W.D.Okla.1987). After hearing, this court held that its 1977 finding of unitariness had determined that the dual school system had been dismantled and that the purposes of the litigation had thus been achieved. The school district's continued adherence to the Finger Plan from 1977 until 1985 had "further insured that all vestiges of prior state-imposed segregation had been completely removed." *Id.* at 1522. *Green v. County School Board of New Kent County, Va.,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The court examined in detail each of the so-called "*Green* factors"—student assignments, faculty, staff, transportation, extra-curricular activities, and facilities—and concluded with respect to each that the school district had maintained its status as a unitary, nondiscriminatory system. The court also concluded that the ten virtually all black elementary schools resulting from the SRP were caused by residential segregation that could not be attributed to the school district. Perpetuating the busing remedy to eliminate the racial identifiability of these schools would, therefore, "correct" a condition that does not violate the Constitution and thus would exceed the purposes of the litigation. *Id.* at 1521. Accordingly, the court held that the 1972 desegregation decree should be dissolved. The court also upheld the SRP as constitutional, since it had been adopted by the Board for educational, rather than racially discriminatory reasons.

A panel majority of the tenth circuit, over a lengthy dissent by Judge Baldock, again reversed, holding that the court had not applied the proper legal standard for determining when a desegregation decree should be dissolved. *Dowell v. Board of Educ.*, 890 F.2d 1483 (10th Cir.1989). Relying on the standard used for an antitrust injunction in *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), the tenth circuit ruled that a school desegregation injunction must remain in effect until the school board can show that the injunction has brought about "grievous wrong evoked by new and unforeseen conditions." 890 F.2d at 1490 (quoting *Swift*, 286 U.S. at 119, 52 S.Ct. at 464). The court ruled further that the validity of any proposed changes in the plan, such as the SRP, must be judged not by whether they were motivated by an intent to discriminate, but rather by their effect on the racial balance in the schools. Since the SRP did not maintain the racial balance of the original 1972 busing plan, the tenth circuit concluded that the SRP could not be implemented. Indeed, on this question— whether the SRP "maintained unitariness in student assignments"—the tenth circuit ruled that this court had "clearly erred in its findings of fact and consequent legal determinations," largely because this court had "failed to address or distinguish plaintiffs' contrary evidence" 890 F.2d at 1503–04.

### The Supreme Court's Decision

The Supreme Court reversed the tenth circuit's decision and remanded the case to this court for further proceedings. *Board of Educ. v. Dowell*, —— U.S. ——, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).[1] Emphasizing that a school desegregation decree is warranted as a temporary measure intended to displace local decisionmaking authority only until " '*transition* to a unitary, nonracial system of public education' is achieved," 111 S.Ct. at 637 (quoting *Green v. New Kent County School Bd.*, 391 U.S. 430, 436, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716 (1968) (emphasis in original)), the Court disapproved of the tenth circuit's reliance upon the *Swift* standard for dissolving antitrust injunctions, which are normally intended to operate in perpetuity. Rather, the Supreme Court agreed with this court's view that the proper standard for dissolving a desegregation decree is provided by the *United Shoe* case: such a decree may be dissolved when its purposes have been fully achieved. With specific reference to the instant case, the Supreme Court observed that "a finding by the District Court that the Oklahoma City School District was being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment, and that it was unlikely that the school board would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved." 111 S.Ct. at 636–37. Echoing this court's observations concerning the limitations on federal judicial authority to supervise local school systems (*see* 677 F.Supp. at 1520–22), the Supreme Court noted:

> Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination."

111 S.Ct. at 637 (quoting *Spangler v. Pasadena City Bd. of Educ.*, 611 F.2d 1239, 1245 n. 5 (9th Cir.1979) (Kennedy, J., concurring)).

---

**1.** The Supreme Court turned first to the Board's contention that the unappealed 1977 finding of unitariness barred Plaintiffs from contesting this court's 1987 order dissolving the injunction. Noting that the term "unitary" had been accorded a variety of different meanings by the lower courts, the Supreme Court determined that the 1977 order "is; unclear with respect to what it meant by unitary and the necessary result of that finding." 111 S.Ct. at 636. Accordingly, the Supreme Court did not disturb the tenth circuit's determination that this Court's 1977 order bound "the parties as to the unitary character of the district, [but] did not finally terminate the Oklahoma City school litigation." *Id.*

The Supreme Court's analysis of governing constitutional principles in this case, as discussed above, thus echoes the analysis contained in this court's 1987 opinion. The Supreme Court, however, did not accept the Board's invitation to reinstate this court's decision terminating the 1972 decree. The Supreme Court's reluctance to do so is hardly surprising since reinstatement would have required the High Court to examine the testimony and exhibits in the record of this case to ensure that this court's factual findings were adequately supported by the evidence (rather than clearly erroneous, as the court of appeals concluded at least in part). Instead, the Court remanded the case for further proceedings in this court, stating:

> [W]e think that the preferable course is to remand the case to [the district] court so that it may decide, in accordance with this opinion, whether the Board made a sufficient showing of constitutional compliance as of 1985, when the SRP was adopted, to allow the injunction to be dissolved. The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable.

111 S.Ct. at 638 (footnotes omitted). With respect to the Board's elimination of the vestiges of past discrimination, the Supreme Court made clear that this court should on remand re-examine all the *Green* factors—student assignments, faculty, staff, transportation, extra-curricular activities, and facilities. 111 S.Ct. at 638–40. This court is also to re-examine, *res nova*, the question whether residential segregation that existed in Oklahoma City in 1985 could be attributed to the school district.[2]

Finally, if the court concludes again that the Board was entitled to have the desegregation decree dissolved as of 1985, it must then evaluate the Board's decision to implement the SRP under traditional equal protection standards—that is, whether the plan was adopted with an intent to discriminate. 111 S.Ct. at 630–38. If the SRP was not adopted with discriminatory intent, then it is to be upheld.

## The Proceedings On Remand

In a memorandum submitted to this court,[3] and at a status conference held on March 7, 1991,[4] Plaintiffs argued that this court should allow them additional discovery, reopen the record, and grant a new hearing to allow them to submit additional evidence. But as the foregoing discussion makes clear, the Supreme Court's instructions simply require this court on remand to reexamine the record from the 1987 hearings—whether the Board was entitled, as of 1985 when it implemented the SRP, to have the 1972 desegregation decree dissolved and its decision-making authority restored, subject of course to traditional equal protection principles. The Supreme Court stated that this Court is to decide "whether the Board *made a sufficient showing* of constitutional compliance *as of 1985,* when the SRP was adopted, to *allow the injunction to be dissolved.*" 111 S.Ct. at 638. (emphasis added).[5]

---

**2.** Unlike the other issues to be re-examined by this court in the remand proceedings, the question of residential segregation is to be treated as *res nova,* ("a question not before decided") because of ambiguity in the tenth circuit's opinion on whether this court clearly erred in finding that present racial segregation in Oklahoma City was the result of private preferences and economics and was too attenuated to be a vestige of the dual system. 111 S.Ct. at 638.

**3.** *Dowell v. Board of Educ.,* No. Civ. 61–9452–B, (W.D.Okla. Mar. 6, 1991) (hereafter "Plaintiffs' Remand Proceedings Memo").

**4.** Reporter's Transcript of Proceedings Had on March 7, 1991, Status Scheduling Conference, *Dowell,* No. Civ. 61–9452–B (hereafter "Status Conf. Tr."), 9–11, 12–15, 22, 26–27, 28–31, 33, 35–36.

**5.** District courts have correctly refused to reopen a case and take additional evidence on remand absent a clear mandate from the appellate court. *See, e.g., Otero v. Mesa County Valley School Dist. No. 51,* 628 F.2d 1271 (10th Cir.1980) (district court correctly refused to receive additional testimony when case remanded with directions for new findings of fact in compliance with Fed.R.Civ.P. 52(a)); *Hennessy v. Schmidt,* 583 F.2d 302 (7th Cir.1978) (district court properly refused to hear additional testimony on remand where appellate court directed "further proceedings" to weigh the evidence under the appropriate legal standard).

**1152**

Nor is there any need for further hearings or submission of evidence. The Supreme Court's instructions do not order this court to "conduct" further proceedings; nor did the Supreme Court use any other language indicating that further hearings should be pursued. Since the court is to decide whether the Board was entitled to have the decree dissolved as of 1985, evidence regarding developments after the 1987 hearings is not relevant. In the 1987 hearings, the parties had a full and fair opportunity to present any evidence concerning whether the 1972 decree should be dissolved. Moreover, the parties took full advantage of that opportunity, submitting a "golconda" of evidence on the very same issues that the Supreme Court's remand now places back before this court. The record thoroughly addresses whether the Board had complied in good faith with the 1972 desegregation decree. *See infra* at 1156–60; *Dowell*, 677 F.Supp. at 1505–06, 1515, 1517–19, 1522. The record also thoroughly addresses each of the *Green* factors to be evaluated in the examination of the vestiges of discrimination: student assignments, *infra* at 1172–75; 677 F.Supp. at 1509–10; faculty, *infra* at 1175; 677 F.Supp. at 1518–19; staff, *infra* at 1177; 677 F.Supp. at 1518–1519; transportation, *infra* at 1177; 677 F.Supp. at 1523; extra-curricular activities, *infra* at 1177–78; 677 F.Supp. at 1519; and facilities, *infra* at 1178; 677 F.Supp. at 1519. The record is replete as well with evidence on the causes of residential segregation in Oklahoma City. *See infra* at 1160–72; 677 F.Supp. at 1506–12. Finally, the record covers in a similarly thorough and complete fashion the Board's reasons for adopting the SRP, and whether it acted with discriminatory intent. *See infra* at 1179–95; 677 F.Supp. at 1513–17.

Plaintiffs argue that the issues now before this court pursuant to the Supreme Court's remand differ from the issues before the court in 1987 pursuant to the tenth circuit's 1986 remand; they contend that the record needs to be reopened to address those differences.[6] Specifically, Plaintiffs argue that the focus of the 1987 hearings was whether changed circumstances justified modification of the desegregation plan to permit adoption of the SRP for grades 1–4. To support this argument, Plaintiffs quote the 1986 tenth circuit opinion framing the issue as whether "changed circumstances require modification or ... the facts or law no longer require enforcement of the [1972] Order" and "whether the original mandatory order will be enforced or whether and to what extent it should be modified."[7]

These tenth circuit remand instructions, however, did not limit the 1987 hearings to possible justifications for the SRP, but rather raised the same issue now remanded by the Supreme Court: whether the Board was entitled to have the injunction—in its entirety—dissolved as of 1985 when it implemented the SRP and whether the Board's adoption of the SRP satisfied constitutional requirements. These were the central issues in the 1987 hearings.

In the final Pretrial Order for those hearings, agreed to and signed by both parties, this court framed the issue remanded from the tenth circuit as "whether the school board can establish sufficient justification for the court to dissolve or modify the 1972 decree."[8] The defendant's written contentions preceding the hearing specified that "dissolving the 1972 decree" was warranted,[9] while the plaintiffs' contentions began by stating that "the modification or dissolution of the decree sought by the school board" was not justified.[10]

In his opening statement at the 1987 hearings, counsel for defendant identified the issue as whether the decree should be

**6.** Plaintiffs' Remand Proceedings Memo at 2; Status Conf. Tr. at 12–15.

**7.** Plaintiffs' Remand Proceedings Memo at 2 (quoting *Dowell*, 795 F.2d at 1523).

**8.** Final Pretrial Order at 2, *Dowell v. Board of Educ.*, 677 F.Supp. 1503 (W.D.Okla.1987).

**9.** Defendant's Contentions at 2–3 (Final Pretrial Order App. B), *Dowell*, 677 F.Supp. at 1503.

**10.** Plaintiffs' Contentions at 1 (Final Pretrial Order App. A), *Dowell*, 677 F.Supp. at 1503.

modified or dissolved, and stated repeatedly the Board's position that the decree should be dissolved entirely. Tr. at 6–9. Defendant's counsel concluded the opening statement by asking "the court to dissolve the 1972 decree." Tr. at 20. In Plaintiffs' opening statement, their counsel "agree[d] with the School Board's presentation of the central issue that is before this court on remand from the Tenth Circuit" as being whether the Court's 1972 injunctive decree should be modified or dissolved completely as "is now sought by this board." Tr. at 21. When this court addressed the basic question in its 1987 opinion, it identified the issue as "Should the 1972 Decree Be Enforced, Modified or Dissolved?" 677 F.Supp. at 1520. This court concluded its 1987 opinion by saying, "[T]he 1972 desegregation decree should be dissolved ... and the court's remedial jurisdiction should be totally relinquished." 677 F.Supp. at 1526. Moreover, as discussed above, the 1987 record thoroughly covers each of the subsidiary questions that the Supreme Court remand directs this court to consider, so the framing of those remand instructions clearly does not create any need to reopen the record.

Plaintiffs further contend that the 1987 hearings considered only the operations of the school district concerning grades K–4, because the focus of those hearings was the SRP, which affected only those grades.[11] Plaintiffs argue that they should be permitted to take additional discovery and to introduce additional evidence concerning grades 5–12, in order to determine whether the Board is entitled to have the 1972 decree dissolved as to those grades.[12]

But since the 1987 hearings centered on the issue of whether the 1972 decree should be entirely dissolved, all grades, K–12, were examined and considered in those hearings.[13] The 1987 hearings covered all grades on the issue of Board compliance with the 1972 decree, with this court concluding that the Board had continued to adhere "to the fundamental tenets of the Finger Plan *at all grade levels* through school year 1984–85" 677 F.Supp. at 1522. (emphasis added). None of the evidence addressing past board compliance with the 1972 decree, or likely future board compliance with equal protection requirements, suggested any limitation to grades K–4. Tr. at 529–31, 619–21, 694–96, 766–69, 812–16, 1224–25, 1244–45, 1376–77. The evidence regarding residential segregation included residential patterns for the entire school district, again covering all grades. Tr. at 37–293, 297–99, 312–20, 333–37, 678, 1026–41, 1100–01, 1114–63, 1168–79, 1223–37, 1233–46; Def. Exs. 1, 2, 3, 4, 5D, 5E, 6, 10, 11, 12, 13, 14, 21, 24, 40; Pl. Exs. 58, 60, 62. The evidence as to student assignments included detailed data covering all grades as well. Tr. at 130–31, 176–77, 184–207, 619–20; Def. Exs. 27, 38, 39, 41, 42, 43, 44, 45, 57, 67, 309. The same is true of the evidence relating to faculty assignments. Tr. at 338, 544–46, 619–21, 812–16; Def. Exs. 187–88. The evidence concerning facilities covered grades 5–12 as well as grades 1–4. Tr. at 619–21, 694–96, 788, 852–53, 893–94. The evidence regarding integration of the school district's central administrative staff also applied to the school district as a whole, Tr. at 542–46, 694–96; Def. Exs. 187–88, as did the evidence regarding extracurricular activities, Tr. at 570, 766–69, 812–16; Def. Exs. 111–24. The evidence concerning transportation of students under the Finger Plan, which was encompassed in the evidence

11. Plaintiffs' Remand Proceedings Memo at 3–4; Status Conf. Tr. at 9–10, 12,–13, 26–27, 29, 36.

12. *Id.*

13. At the Status Conference on this remand held on March 7, 1991, Plaintiffs suggested that this court had limited the presentation of evidence in the initial 1985 hearings on their motion to reopen the case to grades K–4, where the SRP applied. Status Conf. Tr. at 9–10. Plaintiffs then later implied that this limitation applied to

the 1987 hearings as well. Status Conf. Tr. at 36. But regardless of what limitation may have applied in 1985, when the focus was on adoption of the SRP rather than *whether the Board* was entitled to have the 1972 injunction dissolved, no reference to any such limitation is included at any point in the record of the 1987 hearings. Moreover, clearly no such limitation applied in the 1987 hearings because, as shown *infra,* the evidence submitted in those hearings covered all grades, K–12.

relating to student assignments, applied to all grades, as did the evidence concerning transportation under the majority-to-minority transfer option. Neither party disputed that the vestiges of prior discrimination had been eliminated for transportation above the fifth grade, though both parties had the full opportunity to do so and to introduce all relevant evidence.

Plaintiffs also contend that the record needs to be reopened on the issue of residential segregation, because the Supreme Court directed that issue to be reconsidered on remand *res nova*.[14] But the Supreme Court's *res nova* instruction merely means that this Court is to reconsider that issue as if it had not been decided before, reconsidering and reweighing all of the evidence in the record. With respect to all other issues, in contrast, the Court is to consider whether any reason exists to change its previous decision. The phrase *res nova* is regularly used by appellate courts in this way, referring to issues for which there is no precedent deciding the matter, and, therefore, which they must decide for the first time, not issues on which new evidence must be taken. *Scott v. Illinois*, 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979); *United States v. Williams*, 928 F.2d 145 (5th Cir.1991); *Adolph v. Fed. Emergency Mgmt. Agency*, 854 F.2d 732 (5th Cir.1988). Reopening the record on this issue would be flatly contrary to the Court's instructions to consider the Board's right to dissolution of the decree as of 1985. Plaintiffs took full advantage of their opportunity in the 1987 hearings to take discovery and to offer evidence on residential segregation before 1985.

Plaintiffs also argue that they should be allowed to take new discovery and to submit evidence concerning what steps the Board took to decrease residential segrega-

tion, and the results of those measures.[15] Any such evidence, however, could be relevant only to whether residential segregation as a vestige of the school officials' prior *de jure* school segregation had been eliminated to the extent practicable, which was a central issue in the 1987 proceedings, and on which Plaintiffs took discovery and submitted evidence. Moreover, the Board was not required by law to take additional steps outside those ordered in the 1972 decree which was specifically designed to eliminate the vestiges of discrimination, it is unclear how such possible additional steps in regard to residential segregation could be relevant to the Board's right to have the 1972 decree dissolved. Finally, given that this court now reaffirms its 1987 conclusion that current residential segregation in Oklahoma City is not a vestige of prior school segregation, *see infra* at 1160–72, the question of the Board's additional efforts to reduce that segregation could not be relevant to the Board's right to dissolution of the decree in any event.

Plaintiffs request further discovery and evidence on the Board's lack of good faith and intent with respect to adoption of the SRP. However, in the Final Pre-trial Order for the 1987 hearings, agreed to and signed by both parties and the court, the designated factual issues included:

4. Did the school board adopt the 1985 student assignment plan without the intent to discriminate on the basis of race?

5. Did the school board adopt the 1985 student assignment plan for legitimate, non discriminatory reasons?[16]

The defendant Board also repeatedly raised this issue before, during, and after the hearings, actually assuming the burden of proof.[17] Plaintiffs had a complete opportu-

---

**14.** Plaintiffs' Remand Proceedings Memo at 2–3; Status Conf. Tr. at 13.

**15.** *Id.*

**16.** Final Pre-trial Order at 4.

**17.** The Board's written contentions preceding the hearings specified: "The 1985 Student Assignment Plan was not adopted with discriminatory intent." Defendant's Contentions, Final

Pretrial Order at 3. The contentions then specified nondiscriminatory reasons for adoption of the SRP. *Id.* In its pretrial brief, the Board stated: "This court must determine whether or not the neighborhood school plan was motivated by discriminatory purpose." Trial Brief of Board at 16. The Board also stated:

In any event, the question of discriminatory intent must be addressed and under the analysis of the Tenth Circuit it appears the Board of

nity to fully contest this issue at the hearings in an attempt to prevail on an independent constitutional challenge to the SRP apart from the 1972 decree. This court, reflecting the litigation of the issue at the 1987 hearings, ruled on the discriminatory intent question after discussing it at length in the opinion. It concluded that the Board had actually carried the burden of proving that the SRP was adopted without discriminatory intent.[18] *Dowell v. Board of Educ.*, 677 F.Supp. 1503, 1513–17 (W.D.Okla.1987). The court therefore concludes that the existing record in this case is more than adequate to decide the issue of discriminatory intent based on the Supreme Court's remand, particularly given that the Board actually carried the burden of proving a lack of discriminatory intent.

Plaintiffs also ask for further discovery and submission of evidence on the Board's compliance with the Finger Plan from 1972 to 1985.[19] But, again, that question was a key issue in the 1987 hearings, and Plaintiffs had the right to complete discovery and submission of evidence on this issue at that time.

Plaintiffs also request further discovery and evidence submission on the effects of the SRP after its implementation in 1985.[20] But evidence regarding post–1985 effects of the SRP cannot be relevant to whether the Board had a right to dissolution of the decree as of 1985. It can have only the most marginal relevance to whether the Board adopted the SRP with discriminatory intent. Direct evidence concerning what the Board said or did in 1985 when it adopted the SRP is the most relevant to this question. Evidence regarding the actual effects of the SRP is only circumstantial. It would tend to corroborate the stated intentions if the actual results turn out as intended, thus showing that it was reasonable to believe the Board actually held the stated intentions.

Plaintiffs again had a full opportunity in the 1987 hearings to take discovery and offer evidence on the effects of the SRP from 1985 to 1987 for this purpose, and submitted nothing other than the evidence regarding racial balance in the schools. Indeed, the evidence in the record on SRP effects for 1985 to 1987, marginally relevant to the issue of discriminatory intent as it is, consistently corroborates the Board's stated nondiscriminatory intentions in 1985. *See infra* at 1188 n. 73, 1189 n. 74, 1191 n. 76. Evidence on these effects after 1987 would have even less salience as to what the Board actually intended in 1985. Plaintiffs have given no indication that they could make any showing based on this post–1987 evidence which would be sharply different from the 1985 to 1987 evidence. Indeed, Plaintiffs do not even suggest that they would offer the evidence for the purpose of showing discriminatory intent.[21] This court, therefore, finds that Plaintiffs have not indicated that they would submit evidence that could show discriminatory intent on the basis of the entire record in this case; consequently, there are no grounds for reopening the record and holding new hearings. If Plaintiffs believe that evidence regarding the impact of the SRP demonstrates a new constitutional viola-

Education has the burden. Thus, the Board will show that its 1985 Student Assignment Plan was adopted without the intent to discriminate on the basis of race.
*Id.* at 17. *See also id.* at 16–20.
In the opening argument for the 1987 hearings, the Board's counsel stated:
[T]he way we interpret the Tenth Circuit's decision, your honor, is that the Board of Education, although we're unitary, we have the burden of showing that that plan is nondiscriminatory since the original decree was never dissolved, and we will do that through our evidence in this case.
Tr. at 9–10. The Board revisited the discriminatory intent issue extensively in its proposed findings submitted after the hearings. *See* Board's

Proposed Findings of Fact and Conclusions of Law at 31–37, 50.

18. *This court specifically concluded:*
At trial, the Oklahoma City Board of Education carried the burden of proof; this court concludes that the Board proved by a preponderance of the evidence that its new student assignment plan was adopted without the intent to discriminate on the basis of race.
*Dowell,* 677 F.Supp. at 1516.

19. Plaintiffs' Remand Proceedings Memo at 4.

20. *Id.* at 4–5; Status Conf. Tr. at 10–11, 35–36.

21. *Id.*

tion, then they may bring a new action, in which they would be allowed full discovery and submission of evidence on that question.

Plaintiffs seek discovery and evidence submission as well on whether the Board considered alternatives to the attendance zones used in the SRP.[22] But Plaintiffs again had full opportunity to take discovery and submit evidence on this issue in the 1987 hearings.

The court allowed Plaintiffs a further opportunity in a written submission to identify any issue on which receipt of additional evidence would be justified, or any particular item of evidence that could justifiably be submitted for the record at this time. Plaintiffs did not identify any such additional issue or evidence that warranted reopening the record. Consequently, the court and the parties now proceed by reexamining the evidence in the record of the 1987 hearings and reconsidering the issues remanded by the Supreme Court as described above.

II. THE INJUNCTION SHOULD BE DISSOLVED BECAUSE THE SCHOOL BOARD HAS COMPLIED IN GOOD FAITH WITH ITS TERMS AND THE VESTIGES OF PRIOR SEGREGATION HAVE BEEN ELIMINATED.

A. The Oklahoma City School Board Has in Good Faith Fully Implemented and Complied with the Court's 1972 Decree, and Will Not Ever Return to a System of De Jure Segregation.

In its 1985 opinion, this court stated that "[a]t the time this court totally relinquished its jurisdiction over this case in 1977, the court was convinced that the Finger Plan had been carried out in a constitutionally permissible fashion and that the School District had reached the goal of being a desegregated non-racially operated and unitary school system." *Dowell*, 606 F.Supp. at 1554. Moreover, the court found that "[t]he evidence in this case demonstrates

that the Oklahoma City School District remains unitary today [in 1985]." *Id.* at 1555. The court reaffirmed this conclusion in 1987, finding that "the school district's continued adherence to the fundamental tenets of the Finger Plan at all grade levels through school year 1984–85 further insured that all vestiges of prior state-imposed segregation had been completely removed." *Dowell*, 677 F.Supp. at 1522.

On appeal, the tenth circuit acknowledged the fact that "[a]side from minor alterations necessitated, for example, by a school's closing, the Board maintained the District under the Finger Plan's basic techniques of pairing, clustering, and compulsory busing, even after the district court declared the District unitary and terminated the case" in 1977. *Dowell*, 890 F.2d at 1486. Nevertheless, the court of appeals discounted the significance of this finding, stating: "Nor, in our view, does a finding of unitariness mandate the later dissolution of the decree without proof of a substantial change in the circumstances which led to issuance of that decree." *Id.* at 1492.

The Supreme Court reversed this ruling, holding that "in deciding whether to modify or dissolve a desegregation decree, a school board's compliance with previous court orders is obviously relevant." 111 S.Ct. at 637. Moreover, apparently relying on this court's prior opinions, the Court stated unequivocally that "the Board complied with the decree in good faith until 1985. Not only do the personnel of school boards change over time, but the same passage of time enables the District Court to observe the good faith of the school board in complying with the decree." *Id.* at 637–38. Nevertheless, the Supreme Court has instructed this court to consider anew "whether the Board had complied in good faith with the desegregation decree since it was entered." *Id.* at 638.

█ A fresh review of the evidence previously presented by both Plaintiffs and the Board indisputably demonstrates that this court's prior findings were not in error and that the Oklahoma City School District

---

**22.** Plaintiffs' Remand Proceedings Memo at 4.

complied in good faith with this court's 1972 Decree from the time of its issuance through the 1984–85 school year.[23] Dr. Arthur Steller, the superintendent of the school system, testified that the Finger Plan, both before and after the 1977 finding of unitariness brought about "a unitary school district in terms of transportation, student populations, faculty assignments, extracurricular activities, curriculum, facilities, resources, those kinds of things, I think the Finger Plan met its objective and it accomplished what it was originally intended to accomplish." Tr. at 766. Two of Plaintiffs' expert witnesses, Drs. Mary Lee Taylor and Gordon Foster, likewise testified to the effectiveness of the Finger Plan. Tr. at 1224–25, 1244–45, 1336–37. Neither party presented evidence that in any way indicated that the Board had not complied in good faith with this court's order throughout the period from 1972 to 1985. The court therefore finds that the Board has fully implemented and complied with the desegregation decree during that period.

While Plaintiffs contest the Board's good-faith compliance with the 1972 desegregation decree, they do not offer any suggestion or hint of any noncompliance with the tenets of the decree from 1977–1985.[24] Effective compliance with the desegregation plan's requirements during this nine-year period is, therefore, uncontested in this case. This alone should be sufficient to establish good-faith compliance, for the Supreme Court in remanding this case stated that dissolution of a desegregation decree would be warranted after "compliance with it for a reasonable period of time." *Board of Educ. v. Dowell,* —— U.S. ——, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991).[25] *See also Spangler v. Pasadena City Board of Educ.,* 611 F.2d 1239, 1243 (9th Cir.1979) (Kennedy, J. concurring, said substantial compliance with decree for four years and total compliance for five years was sufficient to show good-faith compliance justifying dissolution of the decree); *Riddick v. School Bd.,* 784 F.2d 521 (4th Cir.), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986). (reestablishment of neighborhood schools after eight years upheld); *Price v. Austin Indep. School Dist.,* 729 F.Supp. 533 (W.D.Tex. 1990), *aff'd,* 945 F.2d 1307 (5th Cir.1991) (reestablishment of neighborhood schools after seven years upheld).

Plaintiffs seem to challenge the Board's pre–1977 good-faith compliance with the 1972 decree in reciting snippets from early reports of the Biracial Committee and from orders of this court on various issues that arose during implementation of the 1972 decree.[26] But in 1977, in declaring the

---

**23.** The tenth circuit has criticized the Board's adoption of the SRP as a violation of the 1972 injunctive decree. 890 F.2d at 1492–93. However, the Supreme Court stated, "[W]e do not think that the Board should be penalized for relying on the express language" of this court's 1977 order relinquishing jurisdiction and expressly instructed that this court, "in its decision on remand[,] should not treat the adoption of the SRP as a breach of good faith on the part of the Board." 111 S.Ct. at 638 n. 1.

**24.** Indeed, Plaintiffs seem at least implicitly to concede compliance during this period, saying in their proposed findings that "the passage of a few years" between "1976 and the adoption of the SRP ... is insufficient to assure the Court that the Board is not likely to return to its former ways." Plaintiffs' Proposed Findings at 79.

**25.** The Supreme Court emphasized: "From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." 111 S.Ct. at

637. The Court also emphasized that a desegregation decree was to be considered a "transition" phase to a unitary school system. *Id.*

**26.** In this entire discussion by Plaintiffs, only one or two violations of the 1972 decree are specifically alleged. One is an allegation by the Biracial Committee relating to the initial phase-in of the desegregation decree in 1972. No evidence is offered in support of the vague charge that the phase-in was somehow not "carried out as required in the [1972] order," and this court never issued any ruling in regard to such allegation. The discussion also raises complaints regarding the distribution of black principals and administrators. Otherwise, the discussion involves the Board's responsiveness to suggestions of the Biracial Committee and others, requests from the Board to the court for changes in the details of the 1972 decree, and other minor matters that did not involve violations of the terms of the 1972 decree. Moreover, Plaintiffs do not mention the praise for the Board and the operation of the schools in the Biracial Committee Reports dated May 1, 1973,

school district unitary and terminating the case, this court specifically considered *all* of the Biracial Committee reports from 1972 to 1977, and the matters that came before it during that time, and concluded that the Board had complied with the decree in good faith during this period. The court said:

> "This Court has carefully reviewed this evidence and all of the reports it has received from the defendant and the Biracial Committee since the inception February 1, 1972, of "A New Plan of Unification for the Oklahoma City Public School System," commonly known as the Finger Plan. The Court has concluded that this was indeed a Plan that worked and that substantial compliance with the constitutional requirements has been achieved. The School Board, under the oversight of the Court, has operated the Plan properly...."

Order Terminating Case at 1 (filed Jan. 18, 1977). This order, as the Supreme Court recognized, 111 S.Ct. at 636, remains the law of this case for the matters it addresses. *See also Dowell v. Board of Educ.,* 795 F.2d 1516, 1522 (10th Cir.1986) (the 1972 order "is binding upon the parties"). Therefore, the Board must be found to have complied with the decree from 1972 to 1977 as well.

Plaintiffs emphasize criticisms of the Board's conduct which appeared in this court's 1976 opinion regarding legal fees.[27] But those criticisms all involved Board conduct before the 1972 desegregation decree. 71 F.R.D. at 51–56. The plaintiffs, indeed, discuss pre–1972 conduct of the Board at great length and seek to tie such conduct to the good-faith compliance issue. Such pre–1972 conduct, however, is not relevant to whether the Board complied with the 1972 decree in good faith. The Supreme Court explicitly instructed this court to "address itself to whether the Board had complied in good faith with the desegregation decree *since it was entered....*" 111 S.Ct. at 638 (emphasis added). There will, of course, always be a history of discriminatory conduct whenever a desegregation decree has been entered, but such conduct cannot prevent the dissolution of the decree after a reasonable period of compliance has remedied the past violations. Unlike Plaintiffs, the Supreme Court recognized that "the personnel of school boards change over time." *Id.* at 637. After a number of complete turnovers of the Board and office of school superintendent, the conduct of the Board twenty years ago and more has no real bearing on the operation of the Oklahoma City schools today.[28]

---

November 1, 1973, May 1, 1974, May 30, 1974, October 31, 1974, May 1, 1975, and December 1, 1976.

**27.** *Dowell v. Board of Educ.,* 71 F.R.D. 49 (W.D.Okla.1976).

**28.** Plaintiffs also attempt to question good faith compliance based on events that occurred after the Finger Plan was abandoned and the SRP adopted for grades 1–4. Plaintiffs argue that after adoption of the SRP, faculty assignments became increasingly segregated between predominantly white and predominantly black schools. But since this evidence involves events occurring after the SRP was adopted, it is not relevant to whether the Board had complied with the 1972 decree and had the right to dissolution of the decree as of the time the SRP was adopted, which is the issue on this remand.

Nor can this evidence be relevant to whether the SRP was adopted with discriminatory intent. Faculty assignment policies were not a part of the SRP, so the post-SRP faculty assignment experience does not relate to whether the

SRP was adopted with discriminatory intent. Moreover, the record shows, as this Court has previously found, that the changes in faculty racial composition after the SRP were due to a cause unrelated to any discriminatory intent by the Board—the choices of teachers themselves exercising rights under the District's new collective bargaining agreement with the teachers union. *Dowell v. Board of Educ.,* 677 F.Supp. 1503, 1518–19 (W.D.Okla.1987). Moreover, Plaintiffs' own expert witness testified that the Board had taken highly promising steps to solve the problem by adopting a new policy prohibiting teacher transfers that negatively affected racial balance. The adoption of this policy shows a lack of discriminatory intent by the Board in regard to teacher assignments.

Plaintiffs also assert that a finding of lack of good faith compliance would be justified by adoption of the SRP itself, saying that such noncompliance was shown "by the fact that in 1984 the Board readopted the same neighborhood reassignment plan established in 1955, when sentiment was extremely high in opposition to desegregation as acknowledged by the then current superintendent." Plaintiffs' Pro-

In all the years of litigation of this case, Plaintiffs up until now have never seriously contested the Board's good-faith compliance and implementation of the 1972 decree, except regarding adoption of the SRP. Indeed, if Plaintiffs had ever truly believed a significant violation of the 1972 decree had occurred, they certainly would have brought it before this court to seek enforcement of the decree, as they did regarding the SRP. But quite to the contrary, Plaintiffs up until now have all but conceded good-faith compliance and implementation of the 1972 decree, apart from the SRP.[29]

Moreover, this court in 1985, in reviewing the history of this case, found that:

At the time this court totally relinquished its jurisdiction over this case in 1977, the court was convinced that the Finger Plan had been carried out in a constitutionally permissible fashion and that the School District had reached the goal of being a desegregated non-racially operated and unitary school system.

*Dowell v. Board of Educ.*, 606 F.Supp. 1548, 1554 (W.D.Okla.1985). The court added that: "The evidence in this case demonstrates that the Oklahoma City School District remains unitary today [in 1985]." *Id.* at 1555. The court reaffirmed this conclusion in 1987, finding that:

The school district's continued adherence to the fundamental tenets of the Finger Plan at all grade levels through school

year 1984–1985 further insured that all vestiges of prior state imposed segregation had been completely removed.

677 F.Supp. at 1522. On appeal, the tenth circuit acknowledged as well that

Aside from minor alterations necessitated, for example, by a school's closing, the Board maintained the District under the Finger Plan's basic techniques of pairing, clustering and compulsory busing, even after the district court declared the District unitary and terminated the case.

*Dowell v. Board of Educ.*, 890 F.2d 1483, 1486 (10th Cir.1989). Indeed, based on the unambiguous history in this case on this issue, the Supreme Court has stated as well:

In this case ... the injunctive decree from which the Board seeks relief was entered in 1972, and the Board complied with the decree in good faith until 1985.

111 S.Ct. at 637.

■ In 1987, this court concluded that "there are no indications that *de jure* segregation will again rear its ugly head in this community." 677 F.Supp. at 1526. The court reaffirms this finding today. It is amply supported by the uncontradicted testimony of five different school officials, both black and white. Tr. at 531 (Mrs. Betty Jo Hill, president of the Board) (Oklahoma City school district will never return to the dual system); Tr. at 621 (Dr. Betty

---

posed Findings at 79–80. But the Supreme Court has held in this case that:
 The District Court in its decision on remand should not treat the adoption of the SRP as a breach of good faith on the part of the Board. 111 S.Ct. at 638. Indeed, since this court on remand is to determine whether the Board had the right to dissolution of the 1972 decree as of the time it adopted the SRP, adoption of the SRP itself cannot be relevant to the remanded good faith compliance issue, or to any other question relating to the Board's right to dissolution of the decree.

**29.** Plaintiffs' brief on the merits before the Supreme Court in fact stated,
 [I]ndeed, the [1972] injunction *was* followed in every respect for eight years until it was unilaterally abandoned with regard to the elementary grades in 1984.
Brief for Respondents at 36 (emphasis in original). *See also id.* at 38, 46. In their trial brief for the 1987 hearings, Plaintiffs referenced "the

fact of compliance with the design of the Finger Plan *until* 1985–86...." Plaintiffs' Trial Brief at 6. (emphasis in original). *See also id.* at 5. In their proposed findings after the 1987 hearings, Plaintiffs again referenced "the fact that the School District continued to implement the Finger Plan after 1977, and indeed made attendance changes which continued desegregated elementary schools until the 1985–86 school year...." *See also* Brief for Appellants at 7–8, 22 (submitted by Plaintiffs on the appeal to the Tenth Circuit in 1989).
 Indeed, even in their most recent proposed findings, Plaintiffs acknowledge that, "[t]he Board's showing, in heavy reliance on student attendance and faculty assignment data between 1972 and 1984, is largely a showing of compliance with the [Finger] Plan and evidence that desegregation was in fact occurring." Plaintiffs' Proposed Findings at 82. *See also id.* at 34 ("[T]he approach of the Finger Plan resulted in effective desegregation....").

Mason, black assistant superintendent) (school system could not return to a dual system); Tr. at 696 (Dr. Carolyn Sue Hughes, assistant superintendent) ("I don't believe the citizens of this city would allow [a return to a segregated school system]"); Tr. at 768 (Dr. Arthur Steller, superintendent) (even if the school board wanted to, the community would not allow it to "go back to anything less than what we would refer to as a unitary school district"); Tr. at 815–16 (Linda Joyce Johnson, black affirmative action planner) (the commitment of the Board and the public will preclude a return to a segregated school system). The court credits and adopts the testimony of Dr. Mason on this point:

> It is my opinion that this school system could not return to a dual school system.
>
> First, we believe that at this point in time we have a school board that is committed to the unitary system. If it were, over a period of time, to change, I believe that there would be such a ground swell in this community that that could never come to be.
>
> I believe we have an intelligent, knowledgeable community, and we have an intelligent, knowledgeable work force. I do not believe that it is conceivable that there could be a dual system in Oklahoma City ever again.

Tr. at 621.

In sum, the court finds that the Oklahoma City School District has continuously complied in good faith with the desegregation decree and is not likely to return to its former segregative system.

**B. The Vestiges of Prior *De Jure* School Segregation Had Been Eliminated to the Extent Practicable by 1985, When the SRP Was Adopted.**

**1. *Residential Segregation*** [30]

■ The court is convinced that Plaintiffs would not be engaged in this proceeding except for the issue of residential seg-

regation. Because of such segregation in Oklahoma City, several elementary schools are predominantly black under the SRP. *See infra* at 1192–95. Plaintiffs premised their whole case before the Supreme Court on the issue of residential segregation, arguing that the Board must continue busing for racial balance until whites move into and integrate current predominantly black neighborhoods. Brief for Respondents, *Board of Educ. v. Dowell*, Supreme Court of the United States (No. 89–1080). That essentially remains their position before this court. Such a requirement would likely force busing to continue in Oklahoma City for decades and decades, if not in perpetuity. However, under the Supreme Court's remand instructions, the legal requirement to continue such busing must end if the Board shows that any residential segregation as a vestige of former *de jure* school segregation has been eliminated to the extent practicable. On this basis, several courts have lifted desegregation decrees and allowed the adoption of neighborhood schools despite persisting residential segregation resulting in several predominantly black schools. *Riddick v. School Bd.*, 784 F.2d 521 (4th Cir.), *cert. denied*, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986) (Norfolk—in a virtually identical case to the present one, the school system was found unitary after 4 years of busing, and after 8 more years of continued busing the school board was upheld in reestablishing neighborhood schools for elementary students, even though 10 out of 36 elementary schools became 95% or more black as a result); *Spangler*, 611 F.2d at 1241–42 (Pasadena—busing decree lifted after 9 years); *Ross v. Houston Indep. School Dist.*, 699 F.2d 218 (5th Cir.1983) (Houston—desegregation decree lifted after 12 years).

Residential segregation in Oklahoma City was originally enforced by law. Old Oklahoma City ordinances specified the areas in which blacks and whites were to live.

---

**30.** As discussed, *supra* at 1151 n. 2, unlike the other issues in this proceeding, the question whether residential segregation in Oklahoma City is a vestige of prior *de jure* school segregation is to be decided *res nova*. The court has consequently proceeded to decide this issue as if it had not been decided before, reconsidering and reweighing all of the evidence in the record from the start. *See supra* at 1153–54.

Restrictive covenants prohibiting the sale of homes in white areas to blacks were routinely attached by residential developers to their properties and enforced in the state courts. 219 F.Supp. at 433. As a result of these official, *de jure*, policies, portions of the east inner city area of Oklahoma City were occupied almost exclusively by blacks, and all other sections of the city were occupied almost exclusively by whites. 219 F.Supp. at 433–34. During this time, the Board operated a *de jure*, dual, segregated school system, with schools for blacks located in black residential sections.

Over time, however, these unlawful government barriers to housing integration were removed. In 1935, the Oklahoma Supreme Court declared the Oklahoma City housing segregation ordinances unconstitutional. *Allen v. Oklahoma City*, 175 Okla. 421, 52 P.2d 1054 (1935). In 1948, the United States Supreme Court struck down racial covenants. *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). This decision was echoed by the Oklahoma Supreme Court in 1951. *Correll v. Earley*, 205 Okla. 366, 237 P.2d 1017 (1951). In 1954, the Supreme Court's landmark decision in *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), invalidated Oklahoma's constitutional and statutory provisions mandating separate schools for the races. *See Dowell*, 219 F.Supp. at 431–33.

In place of the old restrictions, new laws protecting the civil rights of blacks were enacted. In 1963, the Oklahoma Legislature established the Oklahoma Human Rights Commission with authority to deal with racially motivated employment discrimination. Okla.Stat. tit. 74, § 951 (1990). In 1965, the Oklahoma City Council passed an ordinance prohibiting discriminatory practices at any place of public accommodation. (Ordinance 11018 (1965)). In 1968, the Oklahoma legislature passed an Act executing within the state the policies of the Federal Civil Rights Act of 1964. Okla.Stat. tit. 25, § 1101 (1990). In 1970,

the Oklahoma City Council enacted fair housing ordinances prohibiting discrimination in housing by financial institutions, real estate brokers, or city employees. (Oklahoma City, OK, Code § 21–166.5 (1970)). In 1980, the Oklahoma City Human Rights Commission was established to assist in the enforcement of civil rights ordinances. (Oklahoma City, OK, Ordinance 15702 (1980)). In 1985, the Oklahoma Legislature enacted detailed statutes prohibiting housing discrimination. (Okla. Stat. tit. 25, §§ 1451–53 (1990).

The record indisputably shows that as the old government housing barriers were removed, and the new protections put in place, most blacks moved out of the original segregated area, establishing new black neighborhoods across broader areas nearby and ultimately spreading throughout the Oklahoma City metropolitan area. One of the Board's expert witnesses, Dr. William Clark, documented this development with U.S. census data. Dr. Clark prepared a census tract map of the Oklahoma City metropolitan area for 1960 that clearly showed the original segregation of blacks in the east inner city area. Def. Ex. 2; Tr. at 45. Dr. Clark documented that in that year 1960, 84% of the black population in the entire Oklahoma City metropolitan area in fact resided in 7 census tracts of the east inner city area. Def. Ex. 5D; Tr. at 44–45, 67–68. The 1970 Oklahoma City area census tract map showed that by that year many blacks had moved to the eastern and northeastern parts of the city and out into the eastern suburbs. Def. Ex. 3; Tr. at 53–54. By 1980, the census tract map showed that blacks had moved into the northern, western, and southern parts of the city to varying degrees, with some moving out into the western suburbs. Def. Ex. 4; Tr. at 60–61. By that year, blacks remaining in the originally segregated east inner city tracts constituted only 16.8% of the Oklahoma City metropolitan area black population, down dramatically from the 84% in 1960.[31] Def. Ex. 5D, Tr. at 67–68.

**31.** The tenth circuit majority criticized Dr. Clark's analysis because it "focused only on seven inner-city tracts and not on additional pre-

dominantly black residential tracts to the north of the studied area." 890 F.2d at 1494. But Dr. Clark's analysis included census data for the

The absolute black population in those tracts declined by 57% from 1960 to 1980,[32] indicating the movement of blacks out of these tracts to the other locations throughout the Oklahoma City area discussed above. These tracts remained overwhelmingly black, however, as few if any whites had moved into them. The record does not include census data after 1980, but it cannot be disputed that the overall, long-standing trend of black integration throughout the Oklahoma City area has proceeded even further since that time.[33]

This black mobility and increased residential integration is documented by other evidence as well. The school district's research department conducted a study of black families with kindergarten children residing in 1974–75 in the east inner city area, who had relocated by 1977–1978. Def. Exs. 7, 28; Tr. at 54–60. The results showed 209 families, or about one half of all relocating families, moving out of the east inner city area and out of the school district. These 209 families moved either to the Oklahoma City suburbs, to other school districts within the Oklahoma City boundaries, or out of the Oklahoma City area altogether. Another 70 families, or about one-sixth of all relocating families, moved out of the east inner city area to mostly white areas in the northern, western, and southern parts of the city and farther east.[34] Another 148 families, or about one-third of all relocating families, moved but stayed within the east inner city area. A later similar study for the Board focused on black families with kindergarten, first grade, or second grade children residing in 1982–1983 in the east inner city area, who had relocated by 1984–1985. Def. Ex. 8; Tr. at 73–77. These results showed 324 families, or 40% of all relocating families, moving out of the east inner city to the suburbs, other school districts within the Oklahoma City boundaries, or out of the Oklahoma City area altogether. Another 180 families, or 22% of all relocating families, moved out of the east inner city area to mostly white areas in the northern, western, and southern parts of the city, and farther east. Another 305 families, or 38% of all relocating families,

entire Oklahoma City metropolitan area from 1950–1980, as shown on the census tract maps he developed for those years. Def. Exs. 1, 2, 3, 4. Dr. Clark focused in particular on the seven predominantly black tracts in the east inner city area because that was the area originally segregated by law, as discussed above, containing 84% of the entire black population for the Oklahoma City metropolitan area in 1960. *See* discussion at 1160–62. The tracts referred to by the tenth circuit north of these seven tracts became predominantly black only after 1960, as Plaintiffs' own expert witness Yale Rabin conceded. Tr. at 1154.

**32.** The tenth circuit majority noted that "[w]hile Dr. Clark's study establishes there is a substantial decrease in black population in these particular tracts, it reveals the same decrease for *total* population." 890 F.2d at 1494 (emphasis in original). But since the area was overwhelmingly black, a substantial decrease in the black population would naturally mean a basically equivalent decrease in total population. In addition, the decrease in total population as opposed to black population would not be of any legal significance in any event. Regardless of what happened to total population in the tracts, the decline in *black population* in the area still supports the main point of Dr. Clark's evidence—that blacks after 1960 were able to and

did leave the original segregated area in large numbers and locate in the areas of their choice throughout Oklahoma City. *See* further discussion, at 1160–64.

The tenth circuit majority also noted that highway construction and major urban development projects within these tracts displaced much black housing, causing blacks to move out of the tracts. 890 F.2d at 1494. But that reason for movement of some of the black population again does not change the critical fact that most blacks have moved out of the original segregated area to areas of their choice throughout Oklahoma City.

**33.** Plaintiffs' own expert witness, Yale Rabin, conceded as much. Tr. at 1137.

**34.** The tenth circuit majority cited Yale Rabin, Plaintiffs' expert, as stating that only 46 of the families moved to mostly white areas from the east inner city area. 890 F.2d at 1496. But Mr. Rabin did not specify the number of black families that moved to mostly white areas. Def.Ex. 7 shows that 46 families moved to the predominantly white northern, western, and southern parts of the city, and another 24 families moved to areas farther east that Def.Exs. 3 and 4 show were also mostly white, for a total of 70 families moving out of the east inner city area to mostly white areas.

moved but stayed within the east inner city area.[35]

■ Another Board expert witness, Dr. Finis Welch, produced additional data showing that in 1972, in 39 out of 88 elementary school attendance zones in the Oklahoma City school district, less than 1% of the students in grades 1–12 living in those zones were black, with no black students at all living in 13 zones. Def. Exs. 11–12; Tr. at 132–40. But by 1986, black students lived in every attendance zone, with no zone less than 2% black. Def. Exs. 11, 12; Tr. at 140–41. Of the 39 attendance zones with less than 1% black students in 1972, 13 were now more than 10% black, and 28 were now more than 5% black. Def. Ex. 11. A statistical extrapolation of this trend in black student residence concluded that by 1995, the lowest percentage of black students residing in any attendance zone would be 16.2%. Def. Exs. 11, 14; Tr. at 141–42. Maps of the Oklahoma City school attendance zones for 1972, 1986, and the 1995 extrapolation illustrate significant numbers of black student residents spreading throughout the school district. Def. Exs. 12, 13, 14.[36]

**35.** The tenth circuit majority suggested that Plaintiffs' expert witness Yale Rabin put this data on the relocation of black families with small children into perspective by noting "many thousands of blacks live in the subject tracts." 890 F.2d at 1496. But the study on relocations in the mid–1970's dealt only with black families in the east inner city area who had children in kindergarten in the public schools in 1974–1975. Def.Ex. 9 shows that there were only 681 such families in that year. The data from this study discussed above consequently shows remarkable mobility for this group: 31% of the total group relocating within three years out of the east inner city area to the suburbs, other school districts in Oklahoma City, or out of the Oklahoma City area altogether, and another 10% relocating within three years to mostly white areas throughout the Oklahoma City school district. Similarly, the study on relocations in the mid–1980's discussed above dealt only with black families in the east inner city area who had children in kindergarten, the first grade, or second grade in the public schools in 1982–1983. Def.Ex. 9 shows that there were only 1811 such families in that year. The data from the study again shows remarkable mobility for this group: 18% of the total group relocating within two years out of the east inner city area to the suburbs, other school districts within the Oklahoma City boundaries, or out of the Oklahoma City area altogether, and another 10% relocating within two years to mostly white areas throughout the Oklahoma City school district.

**36.** The tenth circuit majority suggested that this data produced by Dr. Welch was unreliable because:

Noting that he used two different methods for calculating the 1974 to 1986 figures and the 1986 to 1995 figures, Dr. Welch conceded: "And I really didn't want an inconsistent forecast. I thought someone would be cross-examining me. And so I designed the procedure to be completely internally consistent.... His numbers, he stated, were "guesstimates."

890 F.2d at 1495. The explanation by Dr. Welch concerned the validity of his projections from 1986 to 1995 and did not implicate the reliability of the data for 1972 and 1986, which involved a simple, straightforward presentation of the hard, undisputed information in official school records. Tr. at 132–33.

This court finds that Dr. Welch's concession that he designed his statistical procedure for the projections "to be completely internally consistent" does not in any way undermine the reliability of his projections. Dr. Welch conducted a sophisticated, complex, statistical analysis designed to produce several different projections that would be the most consistent with the historical data and with each other. He designed a procedure that he consistently used for each attendance zone that automatically applied the appropriate statistical model for each zone depending on whether the rate of growth in student population for that zone was constant or changing. Tr. at 236, 238–42. He explained that he was unable to conduct a linear regression for the black percentages in each zone as Plaintiffs' counsel urged. Because linear regressions provide estimates rather than precise mathematical calculations, running a separate linear regression for each subcomponent of the district would not produce results that aggregated to a total equal to the result of the linear regression for the entire district, which was the first step needed to produce the basic data for the ultimate projections for each zone. Tr. at 231–33, 242–44, 247–49. This is where he stated that he chose his method instead, calculating the projected annual black percentages for each zone based on the ratio of the percentage in each zone to the projected district-wide black percentage, so that all of his results would be internally consistent. Tr. at 244, 247–49. From all indications, the method chosen by Dr. Welch was professionally and mathematically sound, and the alternative, aggressively urged by plaintiffs' counsel, was not. *See also* 890 F.2d at 1529 n. 23 (Baldock J., dissenting).

Dr. Welch testified, without contradiction, that the statistical procedures he used were state of the art methods used routinely by demographers and statisticians. Tr. at 241–42. Plaintiffs produced no expert testimony challenging Dr. Welch's statistical procedure or analysis.

The same trends are reflected in dissimilarity and exposure indices measuring the degree of residential segregation among students in the Oklahoma City school district attendance zones. In 1972, the residential dissimilarity index [37] for students residing in the Oklahoma City school district was 0.869, reflecting a high degree of residential segregation. Def. Ex. 40; Tr. at 172. By 1986, this dissimilarity index had fallen to 0.64. Tr. at 172. A statistical extrapolation of this trend projected that by 1992, the dissimilarity index would fall to 0.478, a reduction of almost one half since 1972, and more than halfway towards

Plaintiffs have suggested that Dr. Welch effectively varied his techniques in order to obtain the preconceived results he wanted. But that is not what Dr. Welch said or did. As Judge Baldock concluded, "Dr. Welch should not be faulted for using those procedures which are likely to result in more accurate forecasts." 890 F.2d at 1529 n. 23.

The tenth circuit majority also found Dr. Welch's projections suspect because he characterized them as "guesstimates." 890 F.2d at 1495. But Dr. Welch was simply explaining that his projected numbers, or "point estimates," should be taken as indicating a range of likely results around each number, rather than that the result was likely to be the precise number estimated. Tr. at 246–47, 251. This is a natural feature of such projections. As Dr. Welch testified,

I think it would be appropriate to call these numbers guesstimates, that I think they're straight-faced, they come from a serious procedure that's applied conscientiously, there's no result in terms of configuration that I'm working to. I'm trying to describe the data. I think I've done that.

Tr. at 246. In this court's opinion, Dr. Welch's candor in describing the limitations of his projections enhances rather than undermines his credibility as a witness. *See also* 890 F.2d at 1529 n. 23 (Baldock, J., dissenting).

Finally, the tenth circuit majority suggested that Dr. Welch's projections "directly controverted" the testimony of the Board's other expert witness, Dr. Clark. 890 F.2d at 1495. Dr. Welch's projections showed attendance zones with 90.9% to 100% black students in 1986 becoming between 87.1% and 94.8% black in 1995. Def.Ex. 11. The tenth circuit majority contrasted these projections with Dr. Clark's testimony that "there's a very, very small proportion of white households that will move into neighborhoods that are heavily minority." Tr. at 105.

But while Dr. Welch admitted that the projections were consistent with the possibility of whites moving into the predominantly black areas, they are consistent with other possibilities as well. Nonblack minorities, such as Hispanics, Asians, or Indians, may move into the black areas, reducing the black student percentage. Blacks may also move out of the areas at a faster rate than the few whites or nonblack minorities living there, or the few whites or nonblack minorities may have higher birth rates or child survival rates. Just a "very, very small proportion" of white households moving into the black neighborhoods, as Dr. Clark's testimo-

ny suggested, could in fact contribute substantially to the small declines in black percentages projected by Dr. Welch. Indeed, the projected black percentage declines are all within a reasonable margin of error for such projected point estimates. *Compare* Tr. at 246 *with* Def. Ex. 11.

Even more fundamentally, the suggestion of a conflict here between Drs. Welch and Clark misconstrues the nature of Dr. Welch's projections. Those projections are merely sophisticated extrapolations of the trends in existing data. They do not rely on or produce any reasons or causes for the projected trends. Dr. Welch's projections showed minor declines in black percentages in these heavily concentrated areas solely because of some minor trends in the underlying data, and not because of any assumption or prediction that whites will move into these areas. The projections simply show what will happen if all the existing trends in the underlying data continue unchanged. Such projections are naturally subject to intervening factors that may prevent the extrapolated results from occurring, such as the sociological disinclination of whites to move into heavily black areas. Consequently, because Dr. Welch's projections are extrapolations of current data, and do not involve a prediction or commentary as to the causes of or reasons for the projected results, or even whether the underlying data trends producing those results may continue, Dr. Welch's testimony does not conflict with Dr. Clark's. Indeed, the Board did not use Dr. Welch's projections to argue that whites would move into the predominantly black neighborhoods, and this court never took the projections as showing that.

Of course, this court recognizes that projections into the future, from whatever source and regardless of the soundness of the methodology employed, should not be accorded the same evidentiary weight as hard data concerning what has actually happened in the past.

37. The dissimilarity index in this context is the ratio of the number of students who would have to move to a different attendance zone to achieve perfect racial balance in all attendance zones, relative to the number who would have to move if residential zones were completely segregated. Def.Ex. 40; Tr. at 127–28, 169–70. Consequently, an index of 1.0 corresponds to complete residential segregation, while an index of 0.0 corresponds to perfect integration.

maximum integration. Def. Ex. 40; Tr. at 173–74.

The exposure index[38] for the Oklahoma City school district approximately doubled from 1972 to 1986, from 0.149 to 0.29, meaning the exposure of black students to nonblack students residing in the same attendance zone approximately doubled during this time. Def. Ex. 40; Tr. at 173. The maximum achievable exposure index in Oklahoma City in 1986 was approximately 0.6, the proportion of nonblack students district-wide.[39] The actual exposure index of 0.29 in 1986 was about half this maximum, meaning that about half maximum integration had been achieved. Def. Ex. 40; Tr. at 173. A statistical extrapolation of the exposure index trend projected that by 1992, the index would climb to 0.381, compared to a maximum at that time of 0.55. Def. Ex. 40; Tr. at 174.

Other data showed many blacks had moved to the suburbs outside the Oklahoma City school district altogether. Between 1970 and 1980, blacks living outside the school district boundaries but within the Oklahoma City metropolitan area increased by 140%. Def. Ex. 24; Tr. at 160–162. These suburban blacks constituted about 27% of the black population for the entire Oklahoma city metropolitan area in 1980, Def. Ex. 24, far more than the 16.8% of the total metropolitan area black population residing in the originally segregated east inner city area in 1980, as noted above.

While Plaintiffs attempted to counter this evidence with their expert witness Yale Rabin, his evidence just further illustrated the same trends documented by the Board's evidence. Mr. Rabin produced a census tract map of the Oklahoma City metropolitan area for 1960 that showed the black population by block. Pl.Ex. 58. That map showed the same original segregation of blacks in the east inner city area as Dr. Clark's census tract map for 1960. Def. Ex. 2. Mr. Rabin in fact admitted that at that time "almost all of the black population was confined" to six of the seven census tracts that Dr. Clark identified as holding 84% of the black population at the time. Tr. at 1123. Rabin's analogous census tract maps for 1970 and 1980 also again showed the black population spreading from the original segregated area to new black neighborhoods over broader areas nearby and elsewhere throughout the Oklahoma City metropolitan area, as did Clark's census tract maps for 1970 and 1980 (Def. Exs. 3 and 4) and other evidence discussed above. Rabin's maps did not document the spread of the black population through the Oklahoma City area as well as Clark's maps did because, unlike Clark's maps, Rabin's did not distinguish between areas with 1–10 percent black population and areas with zero or virtually zero black population. Pl. Exs. 58, 60, 62; Tr. at 1138–40. Clark's map for 1980 showed that by that time most census tracts in the Oklahoma City area had at least 1–10 percent black population, while his map for 1960 showed that relatively few did. Def. Exs. 4, 2. Rabin's direct presentation also excluded data showing that the black population in the originally segregated east inner city tracts had declined sharply, both in absolute terms and as a percentage of total black population in the Oklahoma City area. On cross-examination, he admitted the accuracy of this data, even suggesting that the percentage of the total black population in the original segregated area had declined from 70.3% in 1960 to 10.9% in 1980, a steeper drop than Clark had reported. Tr. at 1152–53, 1157–58.

**38.** The exposure index in this context equals the average fraction of students who are nonblack residing in the attendance zone of a randomly drawn or "average" black student. Def.Ex. 40; Tr. at 128–29, 170–71. It measures therefore the proportion of nonblack students to which the random or average black student would be exposed in his residential attendance area. Consequently, an exposure index of 0.0 corresponds to complete segregation, since it means no black students ever have any nonblack students living in their attendance zones. Perfect integration would be reflected by an exposure index equal to the proportion of nonblack students in the district as a whole, since that would mean that each black student has the same percentage of nonblack students living in his or her attendance zone as in the entire district.

**39.** *See* note 38, *supra.*

Mr. Rabin took great pains to show that the area of black residential concentration had changed substantially in Oklahoma City over the years. Rabin noted that in 1950 one tract in the east inner city area was 75% or more black and included 24% of all blacks in the Oklahoma City area, Tr. at 1129–30, though he conceded on cross-examination that the 7 tracts in the east inner city area that Clark had focused on held 83.8% of the total black population in 1950, Tr. at 1157–58. By 1960, 6 census tracts in the east inner city area were 75% or more black and held 69.5% of the total black population. Tr. at 1130–31. By 1980, 16 census tracts in Oklahoma City were 75% or more black and held 60.8% of the total black population. *Id.* But this evidence further confirms the same trend shown by the Board's evidence: that blacks have substantially spread out from the original segregated area to new black neighborhoods over much broader areas nearby, as well as to other areas of Oklahoma City. The exact same spread of blacks to new neighborhoods emphasized by Mr. Rabin can be seen on Dr. Clark's maps. Def. Exs. 1–4. Rabin seemed concerned that Dr. Clark had suggested that only 16.8% of blacks in the Oklahoma City area lived in concentrated black residential areas in 1980, and offered his evidence on change in such concentrated areas to rebut that. Tr. at 1132. But Dr. Clark had made a different point—that only 16.8% of blacks in the Oklahoma City area in 1980 lived in the originally segregated east inner city area.

The above evidence overall shows high black mobility and major increases in residential integration since 1960; nevertheless, significant residential segregation remains in Oklahoma City, with some neighborhoods primarily black and others primarily white. Def. Exs. 4, 13, 40; Pl. Exs. 58, 60, 62. Dr. Clark further testified for the Board on the causes of residential segregation today.

In 1985, the United States Commission on Civil Rights commissioned Dr. Clark to conduct a study on this topic, which Dr. Clark completed and published in 1986. Clark, *Residential Segregation in American Cities: A Review and Interpretation,* 5 Population Research and Policy Review 95–127 (1986). Def. Ex. 10; Tr. at 82. Dr. Clark's study showed that today the factors causing residential segregation are: (1) economics and housing affordability; (2) personal preferences and social relationships; (3) urban structure; and (4) private discrimination. Def. Ex. 10; Tr. at 84.

Dr. Clark found on the basis of the range of published research that economic factors account for 30%–70% of racial separation in America today. Def. Ex. 10, at 1, 103–08; Tr. at 84. These economic factors include income, household wealth or assets, housing affordability, and job location. Regarding personal preferences, the research shows that black households prefer neighborhoods which are 50% black and 50% white, while white families prefer neighborhoods ranging from 0–20% black. Def. Ex. 10, at 1, 109–10; Tr. at 85. Moreover, among all races, people of higher economic status strongly prefer to avoid residential integration with people of lower economic status. Def. Ex. 10, at 107. This strong preference will consequently cause persistent residential segregation between whites and blacks to the extent blacks have persistently lower income and wealth than whites. *Id.*

Regarding urban structure, research shows that many blacks rely heavily on extended family relationships, churches, and neighborhood social institutions in their day-to-day lives, and therefore choose to reside and remain in predominantly black neighborhoods where these social supports continue to be available to them. Def. Ex. 40, at 112, 116–18. People of all races also tend to move near to where they currently live, as they have more information about available housing nearby. Def. Ex. 40, at 116–17; Tr. at 87–88. Consequently, black residential patterns tend to spread out from previously concentrated areas. Dr. Clark found official government discrimination to have little or no effect on residential segregation today. Def. Ex. 40 at 118–20. While private discrimination exists, Dr. Clark found that the other factors described above were predom-

inant in explaining residential segregation today.[40] Def. Ex. 40 at 119–22.

Dr. Clark's analysis is consistent with the above evidence concerning residential patterns and segregation in Oklahoma City. That evidence shows blacks choosing where they want to live throughout the city and surrounding areas, apparently on the basis of such factors as economic status, housing affordability, job location, personal preferences, and social and neighborhood relationships, which cause some to choose current concentrated black neighborhoods or to move near those areas. This conclusion is supported as well by the testimony of a black member of the Oklahoma City Metropolitan Fair Housing Board, and the black leader of an organization of black parents from the east inner city area, both of whom testified that today black people in Oklahoma City can voluntarily choose to reside anywhere in the city that they wish. Tr. at 313 (Biscoe), 678 (White).

█ On the basis of the above evidence, this court finds that any residential segregation as a vestige of former *de jure* school segregation has been eliminated to the extent practicable. The court finds four independent bases for this conclusion:

1. Current residential segregation in Oklahoma City today is caused by the private choices of blacks and whites, based on such factors as economic status, housing affordability, job location, personal preferences, and social and neighborhood relationships. This is shown by the pattern of residential change in Oklahoma City since 1960, with most blacks moving out of the originally segregated east inner city area, spreading to nearby neighborhoods, and ultimately locating to varying degrees throughout Oklahoma City and the surrounding metropolitan area. It is further supported by the analysis of Dr. Clark as to the causes of residential patterns and segregation, and by the testimony of black witnesses who reside in Oklahoma City. It is also supported, not only by the repeal of the old laws mandating residential segregation, but by the passage of new laws prohibiting discrimination and protecting the civil rights of blacks. Since today's residential segregation in Oklahoma City is the product of private choices of blacks and whites, that segregation is not a vestige of former *de jure* school segregation.

Plaintiffs have repeatedly argued that the preferences of blacks and whites, and their economic disparities, were caused or formed at least in part by past official discrimination, and therefore residential segregation resulting from these factors is itself a vestige of prior official discrimination. Tr. at 1222, 1226–29, 1231, 1236. Plaintiffs did not offer any significant evidence to prove, however, that white and black preferences and income disparities were caused by past official discriminatory actions of Oklahoma City or state officials in general, let alone the Oklahoma City school board in particular. Since these same preferences and income disparities exist all over the country, the notion that they could be tied to actions of Oklahoma officials, and of the Oklahoma City school board in particular, is rather far-fetched.

At most, white and black preferences and income disparities have been influenced in part by general societal discrimination, which cannot serve as the basis for a school desegregation remedy imposed on a particular school board. As the Supreme Court said in *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 23, 91 S.Ct. 1267, 1279, 28 L.Ed.2d 554 (1971),

> Our objective ... is to see that school authorities exclude no pupil of a racial

---

**40.** Plaintiffs' witness, Kathleen Silovsky, Executive Director of the Metropolitan Fair Housing Council of Greater Oklahoma City, testified that private discrimination was still a factor in determining where people live in Oklahoma City. Tr. at 1171–72. This does not directly contradict Dr. Clark's testimony that other factors were predominant in explaining today's residential segregation. But even if private discrimination was a more significant factor, that would not make any difference in this case, because the school board does not cause such private discrimination, and housing segregation resulting today from such private discrimination is not a vestige of former *de jure* school segregation. *See also* discussion, *infra* at 1168–71, showing that the law does not require school desegregation remedies to be imposed to counter general societal discrimination and its effects.

minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools.

The Court in *Swann* also said,

> We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious or ethnic grounds.... The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities.

*Id.* at 22, 91 S.Ct. at 1279. *See also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986) ("No one doubts that there has been serious racial discrimination in this country. But as the basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and overexpansive. In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future.") (plurality opinion).[41]

2. The pattern of residential segregation in Oklahoma City today is, in any event, so different from the original pattern of segregation caused by the past policies of official, *de jure*, residential segregation that the current segregation cannot be considered a vestige of that prior segregation. The original segregation was concentrated in seven census tracts in the east inner city area, including 84% of the black population in the Oklahoma City metropolitan area in 1960. Today that area holds only 16.8% of the black population, with blacks moving to other nearby areas, and ultimately throughout the Oklahoma City metropolitan area. Indeed, 27% of the black population now lives in the suburbs outside the Oklahoma City school district, almost twice the proportion still living in the originally segregated east inner city area. The current black residential pattern in the Oklahoma City metropolitan area as a whole is clearly not the segregation caused by law 30 to 40 years ago.

3. Neither the original pattern of residential segregation nor the residential segregation that remains today was in any event caused by past *de jure* school segregation in any significant way. The Supreme Court has made clear that the issue on this remand is whether "present residential segregation in Oklahoma City was ... a vestige of former *school segregation*." 111 S.Ct. at 638 n. 2 [42] (emphasis

---

**41.** Plaintiffs have also emphasized that Dr. Clark testified that whites prefer not to move into an area that is over 30% black. Tr. at 105. Plaintiffs have repeatedly argued that since the government created an originally segregated area with an over 30% black population which whites will not move into, the continued segregation in that area must be considered a vestige of government discrimination. But the decision of whites on whether or where to move is still a matter of their own choice, and since blacks are now free to move out of the originally segregated area, as so many have, the continued residence of some blacks in the area is a matter of their own choice as well. So the continued predominantly black population in that area is due to the choices of whites and blacks today, not to laws repealed over 30 years ago.

Moreover, the preferences of blacks and whites and the other factors noted above have on their own, without the aid of law, created many other areas over 30% black, not only in Oklahoma City, but across the country. *See*

*infra* at 1169–70 n. 45. Consequently, there is no reason to believe that the government's actions in creating the original segregated area have made any significant difference today. The same degree of overall black concentration would most likely have been created in Oklahoma City at the same or different locations, particularly given that the current black population of the originally segregated area seems to cleave to heavily black neighborhoods for any of a number of possible reasons.

Finally, as further discussed below, the school board did not create the originally segregated area and does not have any means today of removing that segregation.

**42.** *See also Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 434–36, 96 S.Ct. 2697, 2703–05, 49 L.Ed.2d 599 (1976) (school desegregation decrees can only be aimed at remedying segregation caused by the school authorities); *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977) (same); *Spangler*, 611 F.2d at 1242–44 (same); *Riddick,*

added). The original segregation in the east inner city area was created by state and local laws mandating such residential segregation, not by school board policies. This court found in 1970 that "the Board did not originate patterns of residential segregation," defining the Board's responsibility to "create and maintain a unitary educational system," not to reverse residential segregation. *Dowell v. Board of Educ.*, 307 F.Supp. 583, 594 (W.D.Okla. 1970).[43] Any discriminatory school board policies adopted after the *de jure* residential segregation practices were nullified had no significant and independent enduring effect in contributing to residential seg-

regation.[44] The school board has not taken any discriminatory action causing or contributing to residential segregation in any way since the old minority to majority transfer policy was fully interred by this court in 1965. No one can explain how discriminatory Board policies prior to 1965 could possibly have caused the greatly different pattern of residential segregation, and much greater integration, existing in Oklahoma City today. Moreover, as the Supreme Court has recognized, residential segregation like that found in Oklahoma City today exists all across the country in virtually every city.[45] The evidence in this

784 F.2d at 536 (same); *Ross,* 699 F.2d at 226–27 (same).

**43.** *See also Dowell,* 219 F.Supp. at 433 (This court said in 1963, "the residential pattern of the white and Negro people in the Oklahoma City school district has been set by law for a period in excess of fifty years."); *Dowell v. School Board,* 244 F.Supp. 971, 975 (W.D.Okla.1965) (this court said, "Negroes in Oklahoma City reside in certain definite areas, which areas were designated as such originally by virtue of state law and were continued through the general use of restrictive covenants.")

**44.** The policy of *de jure* separate schools for whites and blacks was ended in 1955 at about the same time as the laws mandating residential segregation were nullified, and no evidence was introduced to show that this school policy had any significant effect in causing additional residential segregation beyond that caused by the laws mandating residential segregation at the time. The neighborhood school policy adopted by the Board in 1955 did add to residential segregation somewhat in an unanticipated manner. White families remaining in mostly black neighborhoods in or near the original segregated area moved out when their children were assigned to a predominantly black neighborhood school instead of the formerly separate white school. Accordingly, as this court stated in 1965 (cited repeatedly by plaintiffs): "[t]he neighborhood school policy ... serves to maintain and extend school segregation by extending areas of all Negro housing, destroying in the process already integrated neighborhoods" 244 F.Supp. at 977. (*See also* 244 F.Supp. at 976, indicating that some whites were moving under the neighborhood school policy to avoid blacks in the schools).

But neighborhood schools are not an inherently discriminatory practice, so any residential segregation inadvertently resulting from them is not a vestige of former *de jure* discrimination. This court rejected neighborhood schools in the 1960's because they were an inadequate remedy

for the prior *de jure* school segregation, not because the policy itself was discriminatory. Moreover, as indicated by Dr. Clark's testimony (*see supra* note 32) regarding the strong preferences of whites for mostly white neighborhoods, testimony repeatedly credited and further supported by Plaintiffs in their own arguments and evidence, in 1955, whites were already in the process of moving out of these increasingly predominantly black neighborhoods because of such preferences. So whites that moved as a result of the neighborhood school policy would generally have soon moved anyway, as remaining whites in these areas without school children generally did. This effect of the neighborhood school policy was in any event clearly transitory, and the record contains no evidence that it had a significant and independent lasting impact.

The Board operated a minority to majority transfer provision from 1955 to 1965 that was discriminatory because it denied blacks access to mostly white schools on the basis of race. But this provision probably effectively reduced housing segregation rather than increased it because the provision allowed white families in mostly black neighborhoods to send their children to predominantly white schools elsewhere. Thus, the likelihood increased that white families would stay in the black neighborhoods longer. In any event, the record again contains no evidence that this provision had any significant and enduring impact on housing segregation. To the contrary, the evidence concerning the substantial demographic shift in Oklahoma City's black population tends strongly to refute any such notion.

**45.** The Court in *Swann* noted the "familiar phenomenon that in metropolitan areas minority groups are often found concentrated in one part of the city." 402 U.S. at 25, 91 S.Ct. at 1280. Justice Powell, in *Keyes v. School Dist. No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), quotes famed housing segregation expert Dr. Karl Taeuber as saying:

case amply supports the conclusion that today's residential segregation in Oklahoma City would have arisen absent the Board's past discriminatory policies, just as it has in virtually every other American city.

■ Plaintiffs argue that the locations on which the elementary school buildings are sited are a continuing vestige of prior *de jure* school segregation. But this court has never found that where the Board located the schools was part of the constitutional violation in this case, motivated by discriminatory intent. And surely Plaintiffs have waived any attempt to raise such a contention now, thirty years after this suit was begun. Nor does the meager evidence identified by Plaintiffs remotely amount to a showing of a intentionally discriminatory constitutional violation in the school locations.[46] The locations of the schools in operation today were not a part of the *de jure* separate school system that was ended in 1955. Plaintiffs have identified only two schools in the entire district still operating by 1985 that were constructed before termination of the *de jure* separate school system—Garden Oaks and Green Pastures, both built in 1954. Green Pastures is a fifth-year center that has been fully integrated under the Finger Plan, so it cannot be a vestige of discrimination. Of the three schools identified by

Plaintiffs as built in 1955, Parker has never been included in this case as it is too remote from the rest of the District, Longfellow was 26.8% black as early as 1964–65, and Ridgeview was 17.1% black in 1986–87 notwithstanding adoption of the SRP's neighborhood school policy. *See infra* at 1193–94 n. 81.

Moreover, the record contains no evidence to indicate why the current locations of the schools may be considered discriminatory, or to indicate the alternative locations for the schools that would not have been discriminatory. The predominantly black neighborhoods, where in fact the only one-race schools exist today, must have schools in any event to serve their children. Plaintiffs have not indicated any reason why these neighborhoods should not have schools, and the court observes that excluding schools from these neighborhoods would have been discriminatory. Indeed, the plaintiffs themselves have repeatedly suggested that a policy leading to the closure of these schools would be inequitable. Consequently, the record does not show that the Board's location of the schools constituted a discriminatory constitutional violation.

Nor could the school locations have been the effect of a *de jure* discriminatory policy. For the reasons discussed above, cur-

---

No elaborate analysis is necessary to conclude from these figures that a high degree of residential segregation based on race is a universal characteristic of American cities. This segregation is found in the cities of the North and West as well as of the South; in nonindustrial cities as well as industrial; in cities with hundreds of thousands of Negro residents as well as those with only a few thousand, and in cities that are progressive in their employment practices and civil rights policies as well as those that are not.

*Id.* at 223 n. 9, 93 S.Ct. at 2704 n. 9.

Similarly, in *Austin Ind. School Dist. v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), Justice Powell concurring for three members of the Court wrote:

The principal cause of racial and ethnic imbalance in urban public schools across the country—North and South—is the imbalance in residential patterns. Such residential patterns are typically beyond the control of school authorities. For example, discrimination in housing—whether public or private— cannot be attributed to school authorities.

Economic pressures and voluntary preferences are the primary determinants of residential patterns.

*Id.* at 994, 97 S.Ct. at 519 (footnote omitted). *See also Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 489, 99 S.Ct. 2941, 2952, 61 L.Ed.2d 666 (1979) (Powell, J., dissenting); Def.Ex. 10 at 97 (Dr. Clark's study for the U.S. Civil Rights Commission states: "It is clear that black or minority households are separated and concentrated throughout the *major* metropolitan areas of the United States."); Tr. at 83 (Dr. Clark testified: "Most northern cities did not have dual school systems but yet have residential segregation").

**46.** Plaintiffs identify as evidence only four citations of testimony given in hearings in this case in 1965, one of which refers to segregated school systems in general rather than specifically to Oklahoma City, while the other three involve statements of school officials that the Board located some schools in the predominantly black neighborhoods as well as elsewhere.

rent school locations cannot be considered an effect of the separate school system mandated by law until 1955. The discriminatory minority-to-majority transfer policy maintained by the Board from 1955 to 1965 could not have had any effect on school locations, and the record reveals none. A neighborhood school policy is not in itself a discriminatory practice, *see infra* at 1179–80. This court rejected neighborhood schools in 1972 because they were an inadequate *remedy* for the prior *de jure* school segregation in this case, not because the policy was itself discriminatory. So even if the Board's neighborhood policy from 1955 to 1972 affected school location somehow, such an effect would not be a vestige of former *de jure* discrimination.

Consequently, since the Board's location of the schools has not been shown to be an intentionally discriminatory constitutional violation, nor an effect of a *de jure* discriminatory policy, the current locations cannot be a vestige of past discrimination.

Finally, the 1972 desegregation decree says nothing about remedying school locations as a vestige of discrimination. The 1972 decree was to spell out the Board's complete responsibilities in wholly eliminating the former dual school system and all its effects, and the court may not impose new obligations at this late date to further counter any such effects.

■ 4. The Board does not have the power or capability to redress residential segregation in Oklahoma City, and therefore any such residential segregation that might be considered a vestige of former *de jure* school segregation has in any event been eliminated "to the extent practicable." Busing school students clearly does not counter such residential segregation effectively. After 13 years of busing for grades 1–12, and 19 years of busing for grades 5–12, residential segregation persists. During that time period, new residential areas have become mostly black. Def.Exs. 3, 4. The percentage of black students for grades 1–12 residing in the Western Vil-

lage school attendance zone increased from 2.2% in 1972 to 64.0% in 1986. Def.Ex. 11. For the Harrison attendance zone, the black student resident percentage increased from 2.5% to 56.3% over this time. And for the North Highland attendance zone, the percentage increased from 55% to 95%. Def.Ex. 11. The total black population in the North Highland attendance zone increased during this time from 30–35% black to 50–59% black. Tr. at 89–90. The relocation study for black families with young children in the mid–1970's found only one family that moved to the school attendance zone to which their child was being bused, out of 218 families relocating within the school district, and 427 families relocating overall. Def.Exs. 7, 9; Tr. at 59. The study for black families with young children in the mid–1980's found only 11 families moving to the school attendance zone where their child was being bused, out of 485 families relocating within the school district, and 809 families relocating overall. Def.Exs. 8, 9; Tr. at 70. Busing, therefore, does not seem to have influenced residential segregation in Oklahoma City, and continuing busing under the 1972 decree will not significantly affect residential segregation in the future.

Indeed, *Plaintiffs* themselves *insist* that whites, based on their established preferences, will not in any event move into the predominantly black areas and desegregate them. *See supra* note 41. Plaintiffs' own argument shows, therefore, that continued busing under the 1972 decree, or indeed any other busing plan, will have no effect on the residential segregation that concerns Plaintiffs.

Moreover, this court has no clear legal authority for now imposing on the Board new obligations, not included in the 1972 decree, to counter residential segregation. The 1972 decree was to spell out the Board's responsibility in eliminating the former dual school system and its effects, and the Board has engaged in no conduct since that time that would justify imposing additional remedies at this late date.[47] In

---

**47.** As the Supreme Court stated in *Spangler,* 427 U.S. at 436–37, 96 S.Ct. at 2705 (emphasis in original):

any event the record reveals no new remedy that could be imposed on the Board that is likely to be effective in countering residential segregation. Neither the Board nor this court, after all, has any authority over housing. Indeed, experts testifying both for the defendant and for the plaintiffs agreed that no compulsory desegregation implemented by a public school system can eliminate residential segregation, regardless of how long the plan is in operation. Tr. at 115–16 (Clark), 1246 (Taylor). The evidence in fact indicated that no desegregation decree has had the effect of eliminating residential segregation anywhere in America. Tr. at 116; Def.Ex. 10.

■ Finally, the phrase "to the extent practicable" should be taken to limit the duration of a desegregation decree and its busing mandate to a reasonable time frame for what the Supreme Court has said is to be "a temporary measure." 111 S.Ct. at 630. Continuing busing for decades and decades until residential segregation is somehow removed is not practicable, because of the extended loss of control school boards would suffer over their own schools, the extended burden that would be imposed on generations of innocent school children, and the inconsistency of such a requirement with the Supreme Court's pronouncement that the decree be "temporary" and "transitional." *Id.* After nearly 20 years, requiring by judicial decree that the Board continue further busing in Oklahoma City under a rationale—countering

residential segregation—that leaves no end in sight is impracticable.

### 2. *Student Assignments*

This court has now twice reaffirmed its 1977 finding that the Board's faithful implementation of the Finger Plan from its adoption in 1972 until 1985 eliminated the vestiges of prior *de jure* segregation in student assignments in the Oklahoma City public school system. 677 F.Supp. at 1515 ("in 1977, the court was convinced that the Finger Plan had been carried out in a constitutionally permissible fashion and that the school district had reached the goal of becoming a desegregated, non-racially operated, and unitary school system"); 606 F.Supp. at 1554 (same). The principal basis for that finding, as this court noted in its 1985 opinion, was the undisputed fact that "[a]t present, racial balance within 15 percentage points of the proportions in the system-wide student population is maintained in all classes in grades 1–12 through busing." 606 F.Supp. at 1553. The tenth circuit has not disturbed this finding in either of its opinions since the reincarnation of this litigation. 890 F.2d at 1491–92; 795 F.2d at 1522 ("When ... the court determined that the implementation of the Finger Plan had resulted in unitariness within the district, that finding became final, and it, too, is binding upon the parties with equal force").[48]

Review of the evidence presented by both parties during the 1987 hearing convinces this court its earlier finding was not

In this case the District Court approved a plan designed to obtain racial neutrality in the attendance of students at Pasadena's public schools. No one disputes that the initial implementation of this plan accomplished *that* objective. That being the case, the District Court was not entitled to require the [school board] to rearrange its attendance zones each year so as to ensure that the racial mix desired by the Court was maintained in perpetuity. For having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns."

*Id.* at 436–37, 96 S.Ct. at 2705. In so holding, the Supreme Court noted that it was simply

applying a principle established by *Swann*. *See id.* at 426, 96 S.Ct. at 2700. *See also Riddick,* 784 F.2d at 536–37.

**48.** As noted above, the tenth circuit majority founded its 1989 reversal of this court on its conclusion that "compliance alone cannot become the basis for modifying or dissolving an injunction." 890 F.2d at 1491. The Supreme Court reversed, holding that "[t]he test espoused by the Court of Appeals would condemn a school district, once governed by a board which intentionally discriminated, to judicial tutelage for the indefinite future." 111 S.Ct. at 638. The tenth circuit did not dispute this court's finding that, prior to the adoption of the SRP, students assignments in the Oklahoma City school system did not retain the vestiges of *de jure* segregation.

in error. Although it is well settled that the constitution does not require a formerly *de jure* segregated school system to maintain a strict racial balance, *Swann*, 402 U.S. 1, 24–25, 91 S.Ct. 1267, 1280, the school board in this case has proved that it did just that prior to 1985. In order to analyze the degree of racial balance in a school system, sociologists and demographers have developed two inverse measures: the dissimilarity index [49] and the exposure index.[50] Dr. Finis Welch testified that the dissimilarity index is the primary measure, and the exposure index is principally utilized to confirm the results obtained from the dissimilarity index. Tr. at 130.

As this court observed in its 1987 opinion, the dissimilarity index for the entire Oklahoma City school system was "rather segregative at .78" in 1971 immediately prior to the implementation of the Finger Plan. 677 F.Supp. at 1509. By the 1984–85 school year, however, the dissimilarity index for the school district had plummeted to .24. Def.Ex. 45; Tr. at 187–88. As the table set out in the margin demonstrates, the 1984–85 school year was no one year fluke; during the thirteen-year period when the school system operated under the Finger Plan, the dissimilarity index never rose above .28.[51] These results are confirmed by the district-wide exposure index, which, on the implementation of the Finger Plan, immediately rose from .22 in 1971 to .67 in 1972, and declined slightly to .56 by 1984.[52] Likewise, the indices for the high schools, middle schools, fifth grade centers, and elementary schools all reveal dissimi-

49. Dr. Finis Welch explained that the dissimilarity index is calculated by dividing the number of students who would have to be reassigned if each school in the district were to have the district-wide proportion of black students by the number of students who would have to be reassigned if the district were to move from complete segregation to district-wide proportional representation. Tr. at 127–28; Def.Ex. 27 at 45. Thus, the closer the dissimilarity index is to zero, the more integrated the school system; the closer it is to one, the more segregated the school system.

50. The exposure index measures the percentage of non-Black students the average Black student encounters as classmates. Thus, as the exposure index approaches zero, the school system approaches complete segregation. Dr. Welch testified that the upper limit on the exposure index district-wide is the percentage of non-Black students in the district. Tr. at 190–91.

51.

**Dissimilarity and Exposure Indices for the Oklahoma City Public Schools (1971–1984)**

| Year | Enrollment | Percent Black | Dissimilarity Index | Exposure Index |
|------|-----------|---------------|---------------------|----------------|
| 1970 | 71,089 | 22.9 | 0.817 | 0.182 |
| 1971 | 68,840 | 23.4 | 0.780 | 0.222 |
| 1972 | 60,674 | 26.4 | 0.277 | 0.669 |
| 1973 | 54,196 | 26.7 | 0.255 | 0.677 |
| 1974 | 52,143 | 28.3 | 0.236 | 0.670 |
| 1975 | 50,162 | 29.7 | 0.246 | 0.651 |
| 1976 | 47,941 | 31.1 | 0.254 | 0.636 |
| 1977 | 46,274 | 32.3 | 0.270 | 0.619 |
| 1978 | 42,933 | 33.1 | 0.245 | 0.619 |
| 1979 | 42,471 | 34.8 | 0.267 | 0.594 |
| 1980 | 40,961 | 35.3 | 0.230 | 0.603 |
| 1981 | 40,777 | 35.5 | 0.233 | 0.596 |
| 1982 | 41,427 | 35.5 | 0.244 | 0.592 |
| 1983 | 40,513 | 36.7 | 0.234 | 0.584 |
| 1984 | 40,373 | 38.3 | 0.244 | 0.563 |

Def.Ex. 45.

52. Dr. Welch explained that this decline in the exposure index did not indicate declining racial balance, but rather resulted from the "declining fraction of students [in the school system] who are white, and so there's just less opportunity for exposure district-wide." Tr. at 176–77.

larity and exposure numbers in the same ranges achieved system-wide.[53]

To put these statistics in perspective, Dr. Welch compared the racial balance in Oklahoma City with the results from a variety of other similar metropolitan school districts. First, he examined the school districts from the 31 metropolitan areas (excluding Honolulu, Hawaii) closest in population to Oklahoma City. Def.Ex. 38; Tr. at 192–94. Comparing the dissimilarity indices of these school systems, in most cases, for the year 1984 with that of Oklahoma City in 1984–85, prior to the promulgation of the SRP, Oklahoma City ranks eighth of the 32 comparably sized metropolitan areas listed in Defendant's Exhibit 38. Similarly, Dr. Welch compared the Oklahoma City system with the 47 districts having ten or more schools that the Department of Justice has declared unitary. Tr. at 199–200. Def.Ex. 39. Once again, Oklahoma City's 1984–85 data compared favorably with these school districts, ranking eleventh out of 48 school districts listed in Defendant's Exhibit 39. Finally, in a study prepared for the United States Commission on Civil Rights, Dr. Welch also compared the change in the degree of segregation experienced by 125 comparably sized school districts, including Oklahoma City. Tr. at 122–23; Def.Ex. 27. During the period between 1968 and 1982, Oklahoma City achieved the eighth highest drop in the dissimilarity index of the 125 school districts studied. Tr. at 130–31; Def.Ex. 27 at 51.[54]

 The uncontroverted evidence summarized above demonstrates conclusively, from a statistical viewpoint, that during the relevant period the Oklahoma City school system as a whole achieved a racial balance in its student assignments. This finding is further confirmed by an individual examination of the 93 schools that comprised the system during the 1984–85 school year. A review of the racial composition of these schools reveals that the racial balance achieved by the district as a whole existed at virtually every school, at all levels, in the system.

During the 1984–85 school year, 38.3 percent of the 40,373 students in the Oklahoma City public schools were black. Def. Ex. 67. Excluding schools in the Star–Spencer area, which the court exempted from the Finger Plan because of their geographic remoteness, *Dowell v. Board of Education*, 338 F.Supp. 1256 at 1268 (W.D.Okla.1972); Tr. at 212, 343, no elementary school in Oklahoma City had more than 57.4 percent black students. Only Johnson Elementary, at 57.4 percent black, exceeded the Board's goal of keeping each school within 15 percentage points of the district-wide proportion (*i.e.*, 53.3 percent). Pl.Ex. 41; Def.Ex. 57. Likewise, only seven of the 62 elementary schools in the District (again excluding the Star–Spencer area) fell below the district's goal (*i.e.*, 23.3 percent), and four of the seven were within 5 percentage points of the goal. *Id.* Riverside School, the only school in the system less than 15 percent black at 13.6 percent, closed following the 1984–85 school year.

All ten middle schools in the district (outside of Star–Spencer) met the Board's goal of being within 15 percentage points of the district-wide ratio. Def.Ex. 57.

Finally, only two of Oklahoma City's nine high schools (again excluding Star–Spencer High School) fell outside the Board's goal for racial balance: Northeast High School, which was only 1.1 percent above the goal

**53.** The high school dissimilarity index dropped from .72 in 1971 to .25 in 1984, Def.Ex. 41; the middle school index dropped from .71 in 1971 to .19 in 1984, Def.Ex. 42; the fifth grade centers, which did not exist prior to the Finger Plan never topped .18 during the years up to and including 1984–85, Def.Ex. 43; and the elementary schools index dropped from .83 in 1971 to .24 in 1984. Def.Ex. 44.

**54.** The tenth circuit criticized this court's previous reliance upon the impressive drop in the dissimilarity index between 1968 and 1982 on the ground that it "did not show the dissimilarity in the District after implementation of the K–4 Plan in 1985." 890 F.2d at 1495 n. 27. Given the Supreme Court's explicit instruction that this court examine the Board's compliance with the Equal Protection Clause "as of 1985, when the SRP was adopted," 111 S.Ct. at 638, reliance upon this evidence is justified for present purposes.

at 54.4 percent black; and Cleveland Innovative, a small magnet school for the arts including about 200 students that was closed in 1986. Def.Exs. 57, 309.

Thus, even the few schools that fell outside the Board's goal of maintaining a racial balance of within 15 percentage points of the district-wide balance could not be characterized as racially identifiable schools. In sum, as Dr. Welch testified in discussing the Board's continuous efforts to maintain racial balance throughout the course of the Finger Plan, "it seems to me that ... it was ... an extensive attempt to come into tight compliance, very close compliance with the balance established by the Finger Plan." Tr. at 213.

█ It is important to remember that "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann,* 402 U.S. at 24, 91 S.Ct. at 1280. Rather, the duty of a formerly *de jure* segregated school system operating under court order with respect to student assignments is limited to ensuring that they "exclude no pupil of a racial minority from any school, directly or indirectly, on account of race...." *Swann,* 402 U.S. at 23, 91 S.Ct. at 1279. As the evidence set forth above demonstrates, the Oklahoma City School Board went beyond the command of the Constitution during the thirteen years prior to 1985 and achieved a virtually complete racial balance in all of its schools. At an absolute minimum, it is clear that the Board succeeded in "fashion[ing] steps which ... convert[ed] promptly to a system without a 'white' school and a 'Negro' school, but just schools." *Green v. New Kent County School Bd.,* 391 U.S. 430, 442, 88 S.Ct. 1689, 1696, 20 L.Ed.2d 716 (1968). Accord-

ingly, the court finds that, as of 1985, the Board eliminated the vestiges of prior *de jure* segregation in student assignments.

### 3. *Faculty*

█ This court's 1987 opinion did not discuss the evidence in the record concerning racial composition of the faculties in the Oklahoma City school system prior to the implementation of the SRP. Review of that evidence in light of the issue presently before the court will permit only one finding: beyond question, the faculties in the Oklahoma City school system were integrated as of 1985. Indeed, the Board demonstrated that virtually every school in the system maintained racial balance in its faculties during the relevant period.

Vern Moore, the District's Executive Director of Personnel Services, testified that the faculties and principals of all of the schools in the system have been integrated since the implementation of the Finger Plan in 1972. Tr. at 544–45. This testimony was corroborated by that of Dr. Belinda Biscoe, Tr. at 338 (the faculties at all schools system-wide are racially mixed), and Linda Joyce Johnson, the District's affirmative action planner, Tr. at 812–13 (since she was hired by the District in 1976, the faculty throughout the district has been integrated). All of these school administrators are black.

An examination of the racial composition of the professional staff at each school in the system in 1984–85 underscores this undisputed testimony. As the table set out in the margin demonstrates, only five elementary schools of the 79 elementary, middle, and high schools in the system varied by more than 20% from the District goal of maintaining a professional staff composed of 36.9% black members. Def.Ex. 188 at 31–34.[55] Only one school in the entire

55.

**Percentage of Blacks on the Professional Staff in Each School in 1984-85**

| School | Percentage | School | Percentage |
|--------|-----------|--------|-----------|
| | | Elementary Schools | |
| Adams | 18.0 | Arcadia | 38.5 |
| Arthur | 25.0 | Bodine | 24.6 |

system, Linwood Elementary, had a professional staff below 10 percent black (8.6 percent). *Id.* No school had a professional staff above 52 percent black. *Id.* Moreover, as Plaintiffs' expert, Dr. Gordon Foster, pointed out, what little racial imbalance remained in the Oklahoma City faculty assignments in no way correlated with any racial imbalance in student assignments:

In 1984/85, before the 1985 plan took effect in the fall of 1986 [sic], I looked at the ten highest percentage black schools in enrollment at the elementary level. These schools averaged 61 percent black.[56] The faculty assigned to those ten highest percentage black schools in enrollment averaged 31 percent

| School | Percentage | School | Percentage |
|---|---|---|---|
| Britton | 29.0 | Buchanan | 36.4 |
| Burbank | 46.9 | Columbus | 18.5 |
| Coolidge | 17.6 | Creston Hills | 45.0 |
| Davis | 26.7 | Dewey | 15.6 |
| Edgemere | 37.5 | Edwards | 45.0 |
| Eugene Field | 28.2 | Fillmore | 20.0 |
| Garden Oaks | 47.4 | Gatewood | 32.5 |
| Green Pastures | 27.0 | Harrison | 40.0 |
| Hawthorne | 40.0 | Hayes | 27.9 |
| Heronville | 22.9 | Hillcrest | 24.2 |
| Horace Mann | 34.8 | Johnson | 13.7 |
| Kaiser | 30.5 | King | 33.3 |
| Lafayette | 28.6 | Lee | 17.9 |
| Lincoln | 52.0 | Linwood | 8.6 |
| Longfellow | 18.2 | Madison | 25.9 |
| Mark Twain | 17.4 | Monroe | 22.2 |
| North Highland | 35.3 | Oakridge | 25.0 |
| Page Woodson | 27.3 | Parker | 33.0 |
| Parmelee | 24.2 | Pierce | 22.7 |
| Polk | 37.8 | Prairie Queen | 16.2 |
| Putnam Heights | 22.1 | Quail Creek | 25.9 |
| Rancho Village | 19.5 | Ridgeview | 28.6 |
| Riverside | 36.0 | Rockwood | 26.6 |
| Sequoyah | 27.6 | Shidler | 33.3 |
| Shields Heights | 22.7 | Southern Hills | 19.5 |
| Spencer | 37.8 | Stand Watie | 17.1 |
| Star | 33.8 | Stonegate | 21.2 |
| Telstar | 45.8 | Truman | 35.0 |
| Van Buren | 18.2 | West Nichols Hills | 30.8 |
| Western Village | 24.2 | Westwood | 31.7 |
| Wheeler | 21.1 | Willard | 22.2 |
| Willow Brook | 34.0 | Wilson | 16.7 |

### Middle Schools

| School | Percentage | School | Percentage |
|---|---|---|---|
| Capitol Hill | 35.6 | Eisenhower | 42.9 |
| Harding | 34.0 | Hoover | 21.1 |
| Jackson | 36.2 | Jefferson | 27.1 |
| Moon | 33.3 | Rogers | 46.8 |
| Roosevelt | 34.9 | Taft | 21.3 |
| Webster | 25.6 | | |

### High Schools

| School | Percentage | School | Percentage |
|---|---|---|---|
| Capitol Hill | 20.8 | Cleveland Innov. | 23.1 |
| Classen | 33.3 | Douglass | 46.6 |
| Grant | 30.6 | Marshall | 40.0 |
| Northeast | 46.2 | NW Classen | 20.6 |
| Southeast | 26.7 | Star Spencer | 46.2 |

Def.Ex. 188 at 31–34.

**56.** The ten highest percentage black schools in enrollment include all six elementary schools in Star–Spencer (ranking first through fifth and seventh respectively in black enrollment in 1984–85). The Star–Spencer schools had a com-

black.... [I]f you look at the ten lowest percentage black schools in enrollment in 1984/85 before the plan[,] [t]heir enrollment averaged approximately 20 percent black. The faculty assigned to those schools was 24 percent black....

Tr. at 1268–69 (footnote added). Plaintiffs even admitted in their brief to the Supreme Court that "the faculties at all grade levels are currently fully integrated." Brief for Respondents, *Board of Educ. v. Dowell,* Supreme Court of the United States (No. 89–1080) at 31 n. 21.

Based on the evidence summarized above, the court finds that the faculties of the Oklahoma City school system at all levels were integrated as of 1985. Accordingly, the court finds that the vestiges of prior discrimination had been eliminated with respect to faculty assignments.

### 4. *Administrative Staff*

■ This court has previously observed that "the Board has elected to employ intelligent and competent black individuals in upper-echelon central office administrative positions." 677 F.Supp. at 1519.[57] When the SRP was adopted, the Assistant Superintendent for Instruction and Related Services, the Executive Director for Personnel Services, the Director of Middle Schools, and the Director of Elementary Schools were black. Tr. at 542–43. But the integration of the administrative staff was not limited to the top ranks of the central office. In 1984–85, 36 percent (72 out of 200) central office administrators, managers, principals, and assistant principals employed by the Oklahoma City school system were black. Def.Ex. 188 at 21. The support staff employed by the school system was also thoroughly integrated throughout the district as of 1985. Tr. at 812 (Johnson) (support staff integrated at least since 1976

when she was hired). Def.Ex. 188 at 21. As this evidence is uncontroverted, the court finds that no vestiges of prior discrimination remain with respect to the administrative staff.

### 5. *Transportation*

■ Neither party disputed the fact that, with respect to transportation, the vestiges of prior discrimination were eliminated by the Board's faithful implementation of the Finger Plan through 1985. Indeed, it was the transportation of students pursuant to the Finger Plan that resulted in the integration of the schools described above. Furthermore, the Board had fully implemented Policy JCA–M, the majority-to-minority transfer option, prior to the adoption of the SRP. 890 F.2d at 1530 (Baldock, J., dissenting). Thus, far from being a *vestige* of prior segregation, transportation was actually the principal tool utilized to *eliminate* prior segregation. The court, therefore, finds that, with respect to transportation, the vestiges of past discrimination had been eliminated as of 1985.

### 6. *Extra-curricular Activities*

■ As this court noted in its prior opinion, "[p]laintiffs d[o] not dispute that the present curriculum and extra-curricular activities in the school district are nondiscriminatory. A mass of documentary evidence was admitted showing beyond question that the Board is not discriminating in these areas." 677 F.Supp. at 1519. This finding was not questioned by the tenth circuit. The uncontested testimony of Dr. Arthur Steller, Linda Joyce Johnson, and Vern Moore (formerly a principal and Director of Middle Schools) demonstrated that extra-curricular activities were nondiscriminatory. Tr. at 570, 766–67, 814. As Mr. Moore put it, throughout the period after the Finger Plan was implemented in

---

posite ratio of 64.2 percent black students. *See* Def.Ex. 57; Pl.Ex. 41. As noted above, the court did not include the Star–Spencer schools in the Finger Plan because of their geographic separation from the rest of the District.

**57.** The court of appeals did not dispute this finding, although it implicitly questioned this

court's reliance upon it as one basis for inferring that the Board lacked discriminatory intent. 890 F.2d at 1502 n. 48. The court did not disagree with this court's conclusion that the administrative staff of the district was integrated.

1972, "we've set up the kinds of programs that are equal to everyone, all students, as it relates to the extra-curricular activities, and after an exhaustive study concluded that they were not discriminatory in any way." Tr. at 570. The doctoral dissertation of Dr. Betty Mason focused on the school district's extra-curricular activities, and after an exhaustive study concluded that they were not discriminatory in any way. Def.Ex. 128. There is no evidence to the contrary in the record. The court, therefore, reaffirms its 1987 finding that the vestiges of prior segregation had been eliminated as of 1985 with respect to extra-curricular activities.

### 7. *Facilities*

■ In 1987, this court found that "[t]he uncontroverted evidence in this case showed that the school facilities under the neighborhood plan are not discriminatory." 677 F.Supp. at 1519. The tenth circuit did not question this finding on appeal. The evidence in the record amply supports the same conclusion with respect to the period prior to the implementation of the SRP. Dr. Betty Mason testified that "all schools receive[d] the same amount of funds for their operational expenses...." Tr. at 620. Robert Brown, the principal at Martin Luther King Elementary School, noted that "all of our buildings are maintained at approximately the same level." Tr. at 853. Odette Scobey, black principal at Truman Elementary School, testified that all schools received equal treatment and that she continuously received "adequate supplies." Tr. at 788. Indeed, if anything, the evidence suggested that more funds were spent at the predominantly black schools. Def.Ex. 126. The plaintiffs presented no contrasting evidence. The court finds, therefore, that the vestiges of prior segregation with respect to the Oklahoma City school system's facilities and equipment had been eliminated as of 1985.

### 8. *Conclusion*

■ The foregoing examination of the factors listed by the Supreme Court as relevant to the instant question convinces this court that the Board has eliminated the

vestiges of prior discrimination to the extent practicable. This factual conclusion is further buttressed by the more general testimony of two of Plaintiffs' expert witnesses at the 1987 hearing.

Dr. Mary Lee Taylor, qualified as an expert in social psychology, race relations, and racial attitudes, testified as follows:

Q. Now, you're not suggesting, are you, that the Finger Plan, at least while it was being followed, was not effective in desegregating the schools here in Oklahoma City?

A. No. No. Not at all. The Finger Plan was quite effective in doing just what it was intended to do, which was to unlink the schools and housing ..., and, during the years of the Finger Plan implementation [*i.e.*, 1972–1985], *the impact of that earlier discrimination was not felt in the schools.*

Tr. at 1224–25 (emphasis added); *see also* Tr. at 1244–45.

Dr. Gordon Foster also concluded that the district was "unitary" prior to the implementation of the 1985 SRP. Tr. at 1337. Although the Supreme Court in this case has since cautioned against an over-reliance on the term "unitary," 111 S.Ct. at 636, the court finds this testimony significant in light of Dr. Foster's understanding of the term.

Dr. Foster, who was qualified as an expert in educational administration and school desegregation planning and implementation, explained his understanding of unitary status as applying when the school system has "affirmatively correct[ed] the discrimination involved originally in a dual system. And, as I understand it, there are six major areas you look at in doing that, which include pupil assignment, staff assignment and employment, facilities, extra-curricular activities, and so forth." Tr. at 1336. In this case, Dr. Foster concluded that "[i]n my mind, the only thing that separated it from being unitary, in light of the conditions I've just described in my testimony, was the action the Board took in the 1985 plan...." Tr. at 1337.

In short, even Plaintiffs' experts agree that during the relevant time period the board had successfully eliminated the vestiges of prior discrimination. For the reasons set forth above, this court agrees with this conclusion and so finds. Having also found that the School Board fully and continuously complied with the 1972 injunction and in accordance with the Supreme Court's instructions, 111 S.Ct. at 638, this court concludes that the 1972 injunction should be dissolved.

## III. THE SRP WAS ADOPTED FOR LEGITIMATE, NON–DISCRIMINATORY PURPOSES AND THEREFORE SATISFIES EQUAL PROTECTION REQUIREMENTS

Since the court has determined that the Board had the right to termination of the 1972 decree as of 1985, the next step under the remand from the Supreme Court is to examine the constitutionality of the SRP:

> If the Board was entitled to have the decree terminated as of 1985, the District Court should then evaluate the Board's decision to implement the SRP under appropriate equal protection principles.

111 S.Ct. at 638.

██ As the opinions cited by the Supreme Court make clear, the Equal Protection Clause of the Constitution is designed to "[prevent] official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Once a school system has been declared unitary, in order to establish a violation of equal protection principles, a plaintiff must prove racially discriminatory intent or purpose. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

Plaintiffs allege that to prove discriminatory intent "[i]t is sufficient for plaintiffs to establish deliberate action to bring about

known discriminatory consequences...." Plaintiffs' Proposed Findings at 83–84.

██ Such a standard is flatly contrary to established law. Plaintiffs' standard does not focus on intent, but rather on effect, as Plaintiffs have long preferred, adding only that the decisionmaker knew the effects would result from a chosen action. Indeed, Plaintiffs' position was squarely rejected by the Supreme Court in *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). There, the Supreme Court held that discriminatory intent required more than just "volition" or "awareness of consequences." *Id.* at 279, 99 S.Ct. at 2296. Rather, the Court held, for discriminatory intent to be found, the decisionmaker must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Similarly, in *Arlington Heights*, the Supreme Court held that for discriminatory intent to be found, "invidious discriminatory purpose" must be "a motivating factor." *See also Washington v. Davis*, 426 U.S. at 240, 242, 96 S.Ct. at 2047–48, 2049 (Disparate impact, while relevant, "is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution," there must be a *"purpose or intent* to segregate."); *City of Mobile v. Bolden*, 446 U.S. 55, 71 n. 17, 100 S.Ct. 1490, 1502 n. 17, 64 L.Ed.2d 47 (1980); *Spangler*, 611 F.2d at 1244–45 (Kennedy J., concurring); *Price v. Austin Independent School District*, 729 F.Supp. 533, 549 (W.D.Tex.1990), *aff'd*, 945 F.2d 1307 (5th Cir.1991) ("An awareness of consequences does not amount to proof of a discriminatory purpose.").

Plaintiffs' rule also flatly contradicts the substantial case law which holds that adoption of a neighborhood school system is not by itself unconstitutional, even where the creation of racially identifiable schools is the result.[58] Since the effect of a neighbor-

---

**58.** *Crawford v. Los Angeles Bd. of Educ.*, 458 U.S. 527, 537 n. 15, 102 S.Ct. 3211, 3217 n. 15, 73 L.Ed.2d 948 (1982); *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720, *reh'g denied*, 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979) (Day-

ton II) (neither "the foreseeability of segregative consequences" nor the emergence of one-race schools establishes a prima facie case of purposeful racial discrimination); *Riddick v. School Bd.*, 784 F.2d 521 (4th Cir.), *cert. denied*, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370

hood school policy on the racial population of the schools is known at the time such a policy is chosen, if the deliberate choice of an action known to bring about a disparate impact amounts to discriminatory intent, as under Plaintiffs' rule, then a neighborhood school policy would involve unconstitutional discriminatory intent whenever the policy would create racially identifiable schools.

In determining whether "invidious discriminatory purpose was a motivating factor," the court must inquire into "such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564.[59] Consequently, the court must examine "the totality of the relevant facts" in determining whether discriminatory intent exists. *Id.*

The Supreme Court has approved an instructive list of the factors to be considered in determining whether to draw an inference of segregative intent: (1) the historical background of the action; (2) the specific sequence of events leading up to the challenged action; (3) procedural or substantive departures from the normal sequence of events; (4) legislative or administrative history, especially contemporaneous statements by members of the decision-making body; and (5) the impact of the official action. *Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. at 563–64.

In its 1987 opinion, this court held that "[t]he School Board's K–4 neighborhood school plan is constitutionally and educationally sound." 677 F.Supp. at 1526. The court thoroughly examined the record before it and found that the only evidence which could support a finding of segre-

gative intent was the disproportionate impact which the SRP had upon some black students due to the emergence of a number of 90%+ black elementary schools. 677 F.Supp. at 1517. This court declined, nevertheless, to find segregative intent. It concluded that the preponderance of the evidence at trial proved that the SRP was adopted for a number of non-discriminatory purposes, including primarily to remedy the inequities and oppressiveness in the Finger Plan caused by the substantial demographic changes in Oklahoma City. 677 F.Supp. at 1516.

Consistent with the instructions of the Supreme Court on remand, this court has meticulously reexamined the record in light of the principles set forth in *Washington v. Davis* and *Arlington Heights*. The court concludes once again, as it did in 1987, that the SRP was adopted for legitimate, non-discriminatory purposes and without discriminatory intent. Therefore, it satisfies equal protection requirements.

A. The Board Adopted the SRP to Remedy Inequities in the Finger Plan and Not for Any Discriminatory Purpose

Both the Board of Education and the plaintiffs agree that over time the substantial demographic changes in Oklahoma City rendered the Finger Plan inequitable and oppressive. *See* 677 F.Supp. at 1514. The Board maintains that this resulting inequity, and not any discriminatory purpose, was the primary factor motivating its adoption of a new student assignment plan for grades 1 through 4. This court agrees.

(1986); *Ross v. Houston Indep. School Dist.,* 699 F.2d 218 (5th Cir.1983). *See also Milliken v. Bradley,* 433 U.S. 267, 280 n. 14, 97 S.Ct. 2749, 2757 n. 14, 53 L.Ed.2d 745 (1977) (Milliken II) (The Supreme court "has consistently held that the Constitution is not violated by racial imbalance in the schools, without more."); *Washington v. Davis,* 426 U.S. at 240, 96 S.Ct. at 2048 (The existence of both "predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause"); *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971) (The existence of some

one-race schools within a district "is not in and of itself the mark of a system that still practices segregation by law.")

59. Where the disparate impact is "essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate" and "the statutory history and all of the available evidence affirmatively demonstrate the opposite," discriminatory intent is not proved. *Feeney,* 442 U.S. at 279 n. 25, 99 S.Ct. at 2296 n. 25.

### 1. *Operation of the Finger Plan and Adoption of the SRP*

The Finger Plan restructured high school and middle school attendance zones so that each school enrolled both black and white students. The Plan established an elementary school (grades 1–5) feeder system under which students were assigned to a high school (grades 9–12) or a middle school (grades 6–8) based on the elementary attendance zone in which their home was located. 677 F.Supp. at 1513.

Under the Finger Plan, the majority black elementary schools located in the east inner-city area were converted into fifth-year centers with enhanced curricula, while all other elementary schools served grades 1–4. White students attended their neighborhood school for grades 1–4 and were bused to the former black schools for the fifth grade. Black students formerly assigned to the schools now used as fifth-year centers were bused to the previously majority white schools for grades 1–4 and attended what were previously their neighborhood schools for the fifth grade. 677 F.Supp. at 1513. Each elementary school maintained a kindergarten. Kindergarten children were exempt from forced busing and could attend their neighborhood school or another school of the parents' choice. 890 F.2d at 1486.

If racial balance existed in an elementary neighborhood zone at the time of the adoption of the Finger Plan or was subsequently achieved through demographic change, the elementary school in that zone qualified as a K–5 "stand-alone" school.[60] When the Board recognized "stand-alone" status had been achieved, the fifth grade was returned to the neighborhood elementary school, and children were no longer bused into or out of that neighborhood zone to achieve racial balance. 677 F.Supp. at 1513.

Between 1982 and 1984, the school district's planning, research, and evaluation department conducted a number of studies on the "stand-alone" feature of the Finger Plan. The results of these studies revealed certain inequities directly linked to the K–5 "stand-alone" concept. *See* Def. Exs. 69–75. When the Board recognized Bodine Elementary School in southeast Oklahoma City as a K–5 "stand-alone" school in 1984, the perceived inequities surfaced once again. Tr. at 381. As a result, in July 1984, the Board appointed a committee to study the K–4 elementary schools under the Finger Plan, including the K–5 "stand-alone" school concept and to report back with recommendations.

The committee was composed of three School Board members. Dr. Clyde Muse, a black minister with a Ph.D. in education, chaired the committee. The other committee members, Mrs. Susan Hermes and Mrs. Betty Hill, each had prior experience as certified school teachers. Over the course of approximately six months, the committee convened on an almost daily basis at the school district's research department. Tr. at 306–07. Data and statistics were provided to the committee by the district's research staff. Dr. Muse traveled to the Office of Civil Rights in Dallas, Texas, for consultation and advice. Tr. at 427–28.

In November, 1984, the committee presented its report to the Board. The committed study revealed that after the Finger Plan was implemented in 1972, demographic changes gradually integrated an increasing number of neighborhoods in Oklahoma City, particularly those located in the central part of the city. In 1985, as a result of these demographic changes, approximately thirteen (13) elementary schools qualified for K–5 "stand-alone" status. Tr. at 427. The study further revealed that if K–5 "stand-alone" status were granted to the ever-increasing number of elementary schools which qualified, then the young black students previously bused into those schools from the east inner-city area would have to be reassigned to more distant K–4 schools. Tr. at 425. Since most of the racially balanced neighborhoods were located in the center of

---

**60.** To qualify for "stand-alone" status, the neighborhood zone was required to be twenty to fifty percent black. Tr. at 218.

Oklahoma City, and many of the newly-eligible "stand-alone" schools were also centrally located, black students in grades 1–4 would have to be bused to schools located farther north, west, or south.[61] Thus, the gradual racial integration in Oklahoma City would increase the busing burden, in terms of time and distance, on young black children in grades 1–4. Tr. at 425.[62]

The committee also identified several problems with the fifth-year centers arising from increased residential desegregation. When a "stand-alone" school reacquired its fifth grade, the student population at the existing fifth-year centers, located in the primarily black east inner-city, would correspondingly drop. Tr. at 426. Under school district guidelines, if enrollment in a given school dropped below established minimums, the school was subject to closing. The ultimate effect would be to leave a predominantly black part of the community without elementary schools. Moreover, all fifth-year centers had enrichment programs which included intramurals, string instruments, special interest sessions and "Opening Doors" programs. Def.Ex. 95. The committee determined that it would be increasingly difficult to make these special fifth-year center programs equally available on a district-wide basis to all of the potential K–5 "stand-alone" schools. *See* Def.Ex. 95.[63]

Plaintiffs attempt to discredit the nondiscriminatory basis for adoption of the SRP by arguing that the Board did not follow any consistent policy in regard to stand-alone schools under the Finger Plan, and, therefore, the potential problems and inequities that would arise from the designation of more of the qualifying schools as stand-alones could not have been the basis for adoption of the SRP.[64] But the establishment of stand-alone schools when certain qualifying criteria were met was clearly part of the Finger Plan. The problems and inequities that would have arisen by 1985 if the Finger Plan and its stand-alone policy were faithfully followed was undeniably part of the legitimate, nondiscriminatory grounds *for abandoning the Finger Plan* for grades 1–4.

In view of the identified problems with the Finger Plan, the committee recommended adoption of a new student assignment plan establishing neighborhood

**61.** The schools eligible for K–5 "stand-alone" status for 1984–85 were Arcadia, Bodine, Britton, Edgemere, Eugene Field, Gatewood, Horace Mann, Putnam Heights, Rockwood, Telstar, Western Village, Willow Brook and Wilson. Def.Ex. 72. Two—Bodine (SE) and Rockwood (SW)—were located south of the Canadian River; two—Telstar (NE) and Willow Brook (NE)—were located south of the river, but in the northeast Star–Spencer area of the district; six—Edgemere, Eugene Field, Gatewood, Horace Mann, Putnam Heights and Wilson—were located north of the river adjacent to the northeast quadrant; three—Arcadia (NE), Britton (NW) (which included the Nichols Hills and Lone Star attendance areas) and Western Village (NW)—were north of the river and in the far northern portion of the main geographic area. Def.Ex. 88. Thus, although these 13 schools were located throughout the district, the majority of the schools formed a band in the middle of the district.

**62.** The Supreme Court has recognized that "[a]n objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process." *Swann,* 402 U.S. at 30–31, 91 S.Ct. at 1283.

**63.** Another inequitable feature of the Finger Plan was that black students were bused during the first four years to schools outside black residential areas, while white students were not bused until the fifth year. *See* Tr. at 1265 (Dr. Foster). As Dr. Gordon Foster testified, such inequality is "simply the arithmetic of the population" and is inherent in any busing system for a community with the percentage black population of Oklahoma City. Tr. at 1264–65. Of course, a desegregation plan may "not unfairly burden minority students." *Keyes v. School Dist. No. 1,* 521 F.2d 465 at 479 (10th Cir.1975). The SRP, which ended busing for elementary students outside their neighborhoods, remedied this inequality.

**64.** The Board's increasing departure over time from adherence to the simple Finger Plan stand-alone policy reflected the increasing unworkability of that policy. Indeed, the Board's decisions concerning stand-alones were taken in large measure to maximize integration and ensure racial balance in the schools. Tr. 203–07, 290–91 (Dr. Welch), Def.Ex. 85. Significantly, Plaintiffs did not challenge any of the Board's stand-alone decisions prior to adoption of the SRP.

schools for grades 1–4 and five fifth-year centers throughout the district. The committee also presented several alternative courses of action and outlined the reasons why the committee felt these options were less desirable than the neighborhood schools plan. Def.Ex. 79. In December, 1984, all seven members of the Board voted unanimously to adopt the reassignment plan. Def. Ex. 95.

### 2. *Motivation Behind Adoption of the SRP*

Plaintiffs here bear an extraordinary burden in attempting to prove discriminatory intent. This is not the case of an all-white school board imposing its designs on an unwilling black community. In this case, Dr. Muse, a respected black educator, elected to the School Board by the black community, was the principal proponent of the Plan and the leading force in its design and development as the head of the Board committee responsible for the issue. Moreover, at the 1987 hearings, Defendants presented several members of the black community who testified that they supported the plan. *See e.g.*, Tr. at 628–30 (Alonzo Owens, Jr.); Tr. at 638–39 (Dr. Tommy B. White); Tr. at 827–28 (Charles Morgan, III); Tr. at 830 (Gary Eugene Bender). Dr. Tommy B. White, Administrator of the Oklahoma City–County Health Department, testified that he organized a group of parents, educators, ministers and others from the predominantly black northeast quadrant to support equity and excellence in education in the schools there. Tr. at 639–40. The organization, the Coalition for Equity and Excellence in Education ("CEEE"), fully endorsed the SRP and obtained 400 signatures on a petition in support of the Plan. Tr. at 640–41. Ninety-five percent of the 400 signatures were from members of the black community. Tr. at 663. Even Plaintiffs admit that at least "some portion" of the black community in Oklahoma City supported the reinstitution of neighborhood elementary schools. Brief for Respondents, *Board of Educ. v.*

*Dowell,* Supreme Court of the United States (No. 89–1080) at 14.[65]

This substantial support from the minority community was surely not motivated by an intent to discriminate against blacks. These black leaders and individuals must have had legitimate, nondiscriminatory reasons for supporting the SRP, and must have believed it was nondiscriminatory. For Plaintiffs to prevail on this record, the evidence would have to show that these blacks were wrong in their belief that the Plan was nondiscriminatory, and that, despite the existence of legitimate, nondiscriminatory reasons for the SRP persuasive to these blacks, the whites were not motivated by these reasons, but by a discriminatory intent not apparent to the supporting blacks.

■ The court has evaluated the evidence concerning the history and motivation behind the adoption of the SRP and finds a complete absence of segregative intent by the white as well as the black members of the Board. The events leading to the adoption of the SRP, as described above, clearly indicate that the Board was motivated by a desire to remedy perceived inequities in the Finger Plan. Moreover, the court credits the testimony of Board members Dr. Clyde Muse and Mrs. Betty Jo Hill, among others, who confirm that the SRP was adopted to alleviate pressing problems resulting from the old Plan. Dr. Muse was troubled by the implications of the increasing number of schools eligible for "stand-alone" status, particularly the disproportionate impact on black elementary students in the district. Tr. at 424–28. He recognized that the "stand-alone" feature of the Plan had to be eliminated because the Board would always be pressured to create "stand-alone" neighborhood schools in qualifying neighborhoods, perhaps at the expense of the non "stand-alone" components of the elementary system. Tr. at 425–26. As Mrs. Hill related: "Our patrons, our communities, had been told since '72 that, if they became integrat-

---

**65.** Plaintiffs presented only two witnesses at the 1987 hearings from the black community who testified that they were opposed to the SRP. Tr.

at 1407–08 (Clara Luper); Tr. at 1437 (E. Melvin Porter).

ed, they could have a neighborhood school, and they could not understand why they had followed exactly what the court had said and the board was not giving them their K–5 schools." Tr. at 528. The comments of Dr. Muse and Mrs. Hill are corroborated by the minutes of the Board of Education meetings. *See* Def.Ex. 76.

The Board's expert witness, Dr. Finis Welch, confirmed the resultant inequity flowing from the "stand-alone" school concept. According to Dr. Welch, the Finger Plan was "just not a plan that was designed to withstand the kind of demographic change that occurred in this district." Tr. at 220.[66] As Dr. Welch explained, demographic change directly affected the "stand-alone" school feature so as to impose increased busing burdens on the remainder of the district. Tr. at 224–25. Dr. Welch pointed out that the problems inherent in the "stand-alone" concept would continue to increase as more schools became eligible for "stand-alone" status. Tr. at 222–24. Besides the 13 schools eligible for "stand-alone" status in 1985, Dr. Welch projected that six more would become eligible by 1995.[67] Tr. at 224, Def.Exs. 72, 76.

Moreover, the court, as it did in 1987, finds it highly significant that Plaintiffs agree with the Board that the Finger Plan ultimately proved inequitable.[68] Dr. Finger, the author of the Plan and an expert witness for Plaintiffs, testified that compulsory desegregation plans are not designed to last forever, and that changes in plans become necessary as a result of demographic forces. Tr. at 1192. He acknowledged the increased busing burden on young blacks and the potential for the loss of fifth-year centers as a result of the "stand-alone" feature in the Plan. Tr. at 1202. In fact, Dr. Finger expressed surprise that the Plan had not already been modified as a result of demographic change. Tr. at 1198. Another expert for Plaintiffs, Dr. Gordon Foster, also agreed that the inequities resulting from the "stand-alone" feature justified modification of the Plan. Tr. at 1266–67.[69]

### 3. *Procedure for Adoption of the SRP*

Pursuant to the criteria in *Arlington Heights*, this court has also examined the procedural aspects of the Board's decision to adopt the SRP and again finds an absence of segregative intent. The Board's charge to the committee was not specifical-

---

**66.** Dr. Welch identified several limitations inherent in the plan: (1) it was designed in 1972 for an elementary student population that was 20% black, not 40% black as the Oklahoma City schools were by 1984; (2) as more schools qualified for "stand-alone" status, busing distances for those still bused would be longer; and (3) schools housing fifth-year centers would be forced to close if enrollment declined due to fifth grade students attending "stand-alone" schools. Tr. at 219–20, 225–26.

**67.** The tenth circuit majority questioned Dr. Welch's projections of the number of future "stand-alone" schools on the same basis that it questioned his projections on the future percentages of black students residing in the different school attendance zones. 890 F.2d at 1498. For the reasons detailed in note 36, *supra* at 1163–64, this court concludes that Dr. Welch's testimony is credible and reliable. Moreover, Dr. Welch's projections concerning black student residence need only be reliable within a wide margin of error for his forecast of the number of "stand-alone" schools in 1995 to be accurate, as a school is eligible for "stand-alone" status when the student population residing in its attendance zone is anywhere from 20% to 50% black. Finally, even if the court were to dis-

regard Dr. Welch's testimony on this issue, both parties agree that a number of additional schools would become eligible for "stand alone" status by 1995. *See infra* note 68.

**68.** In the Pretrial Order, "Plaintiffs' Contentions" (App. A at 3), counsel for Plaintiffs states:

[T]he 'stand-alone school' feature of the original Finger Plan, over time, increased the burdens borne disproportionally [sic] by [b]lack children. As new areas of the district qualified for 'stand-alone' status the distances which black students in grades 1–4 would have to be transported increased and the likelihood that schools in black residential areas would be closed increased.

In Plaintiffs' Trial Brief at 14, counsel states: "One of the principal bases advanced in 1985 for the system's adoption of a new assignment plan in grades 1–4 was the inequitable burdens being borne by black students residing in northeastern Oklahoma City. These concerns are legitimate ones which are shared by Plaintiffs."

**69.** On appeal, the tenth circuit majority likewise concluded that "because of population shifts in the District, it was necessary to modify the Finger Plan." 890 F.2d at 1498.

ly to establish neighborhood schools, but rather to study the elementary K–5 grade schools with regard to:

1) neighborhood racial makeup;
2) potential busing reduction;
3) possible boundary changes; and
4) possible grade realignments.

Def.Ex. 77. The Board explicitly provided that any changes to the current plan recommended by the committee "must be positive in both an educational and social way." *Id.*

The court finds it significant that the Board considered a number of possible options and actively solicited community involvement and comment on the proposed plans. *See* Def.Ex. 79. At the November 19, 1984, Board meeting, the committee presented three proposed plans to the Board. Def.Ex. 79. Prior to the final vote at the December 17, 1984, meeting, the committee presented a fourth proposal submitted by the teachers' union (Oklahoma City Federation of Teachers), which also advocated the creation of neighborhood schools. *Id.; See generally* Tr. at 502–06 (Mrs. Hill).

The Board encouraged community participation in the evaluation and selection process. All Board meetings were open to the news media and to the public. *See* Def.Ex. 77, 79, 80, 95. The Board set up a "phone bank" to provide the community with accurate information concerning the proposed plan. Def.Ex. 79. "Town meetings" were scheduled in November and a "Special Meeting" in December for public hearings prior to the Board's final vote. Def.Ex. 79, 90. Moreover, the committee, accompanied by other Board members and staff, met with students at the elementary schools and held open evening sessions at several other schools. Def.Ex. 80; *see generally* Tr. at 404–06, 507–08. Notices of these meetings were sent by Donald L. Wright, the Superintendent of the Okla-

homa City Public Schools, to school administrators, community representatives, and parents of all Oklahoma City school children urging their attendance. Def.Ex. 91. The committee proposed several amendments to the SRP based on suggestions and concerns raised at these meetings. Tr. at 508–10.[70] In addition, Dr. Wright also notified representatives from the Regional Office of Civil Rights in Dallas, Texas, of the pending vote on a new elementary school assignment plan, invited them to attend any of the meetings, and solicited their comments on the proposed SRP. Tr. at 428; Def.Ex. 92–93.

The record indicates that the Board thoroughly studied the elementary school situation and conscientiously sought and entertained community comment on the proposed plan. The court here finds no evidence of improper motive or intent. At the conclusion of the evidentiary hearing on the SRP, Plaintiffs' counsel did not ask for more time or advise the court Plaintiffs had more evidence to present.

### 4. Testimony Concerning Intent

The written record of the Board's activities, which amply supports the court's finding of no intent to discriminate, is corroborated by testimony of Board members, black school administrators, and black parents of school children, all of whom testified that, in their view, the Board did not adopt the SRP with discriminatory intent. Dr. Belinda Biscoe, Senior Researcher, Department of Planning, Research, and Education, testified that over the six-month period during which she worked with Dr. Muse and his committee she had no reason to believe or suspect that the committee's actions were motivated by any discriminatory purpose:

Q. Did you at any time observe or sense, from the actions of any of the Board members, that they were in any

---

70. Dr. Belinda Biscoe, Senior Researcher, Department of Planning, Research, and Evaluation, at the time of the adoption of the SRP, testified that:

The Board was real committed to having the plan presented to the neighborhood, to the people in the various communities. They wanted feedback from them. And at that point I spent a great deal of time working with the Board to pull all the information together in a form that would be understandable and digestible to people in the community. Tr. at 308.

way trying to be unfair to any minority students?

A. No, I never sensed that. I would not have been able to work with the Board if I had ever felt that. That just was not the agenda. They were very concerned about equity and about the welfare of all students in the district, and that was really projected in everything they said and did when I worked with them.

Q. As a black person, did you, at any time while working with the Board Committee, sense that they were taking any action which, in your opinion, would have been discriminatory against black students or teachers or parents?

A. No, I never felt that at any time.

Q. Did you feel that the Committee was watching out for the interests of minority students, teachers, and patrons?

A. I felt that they were concerned about minority students and just all students in the district.

Tr. at 311. *See also* Tr. at 353, 415 (Susan Hermes, Board President at the time the SRP was adopted); Tr. at 431 (Dr. Clyde Muse); Tr. at 480–81 (John Fink, Senior Research Associate, Department of Planning, Research, and Education); Tr. at 566 (Vern Moore, Executive Director of Personnel Services); Tr. at 576 (Dr. Betty Mason, Assistant Superintendent for Instruction); Tr. at 679 (Dr. Tommy B. White, leader of organization of black parents); Tr. at 798 (Odette M. Scobey, school principal); Tr. at 12 (Linda Joyce Johnson, Affirmative Action Planner).

Moreover, the testimony of Plaintiffs' expert, Dr. Marylee Taylor, an expert in social psychology and the study of race relations and racial attitudes, also supports this court's finding of lack of discriminatory intent. On cross-examination, defense counsel elicited the following testimony:

Q. Dr. Taylor, it sounds to me from listening to your testimony that you have reviewed a substantial amount of the evidence in this case; is that correct?

A. I have—I have certainly reviewed some of the evidence in this case. Yes.

Q. And including prior case decisions and things of that nature.

A. Yes.

Q. Based upon your educational background and your experience and your review of the facts in this case, you don't feel that the Oklahoma City Board of Education adopted this neighborhood plan with the intent to discriminate against blacks, do you?

A. I have no evidence of that at all. I did not mean to suggest it.

Q. Well, in fact, when you gave us your deposition approximately one month ago under oath you told us that you found no evidence of intentional race discrimination; isn't that true?

A. I probably said I knew of no evidence. I stand by that. *I know of no evidence of intentional—of intent to discriminate by the current school board.*

Tr. at 1237–38 (emphasis added).[71]

The tenth circuit majority concluded that testimony concerning the motivations and good faith of board members or school administrators is irrelevant to deciding institutional intent and that the court should look only to "circumstantial evidence." 890 F.2d at 1503. In *Arlington Heights*, however, the Supreme Court unequivocally established the relevancy and importance

**71.** The tenth circuit majority criticized this court for citing Dr. Taylor's testimony in support of its 1987 finding of no intent to discriminate. The court disagrees with the tenth circuit's position that Dr. Taylor was quoted "out of context" and that her statement "is a nonsequitur." 890 F.2d at 1503 n. 50. Dr. Taylor's quoted testimony is entirely consistent with the general tenor of the preceding line of questioning. Despite her review of much of the evidence and her expertise in race relations and racial attitudes, Dr. Taylor could point to no evidence that would establish an intent to discriminate. Moreover, the court is at a loss to comprehend the tenth circuit majority's claim that Dr. Taylor's statement is a nonsequitur. Her answer was an appropriate response to defense counsel's question; although, given the content of her testimony on direct, it was a surprising response. *See* 890 F.2d at 1523–24 n. 15 (Baldock, J., dissenting).

of such testimony to an inquiry into discriminatory intent. *Arlington Heights*, 429 U.S. at 268, 97 S.Ct. at 565 ("[M]embers [of the decision making body] might be called to the stand at trial to testify concerning the purpose of the official action...."). The tenth circuit essentially attempted to preclude consideration of what it believed was a predictable response from school officials denying any improper motivation. This court, however, is entitled to entertain such testimony and weigh its credibility. In this case, in view of the additional evidence supporting a finding of no discriminatory intent, the court's acceptance of the school officials' testimony is justified. *See* 890 F.2d at 1523 (Baldock, J. dissenting). In any event, the circumstantial evidence supports the same finding, as discussed above.

Plaintiffs further argue that the SRP was adopted in the context of "a long and ugly history of discriminatory official actions in the Oklahoma City public schools," thus suggesting that any Board action was impermissibly historically tainted. But official discriminatory actions by the school district were ended by 1972, when the desegregation decree was ordered and implemented. That history hardly serves as the context for adoption of the SRP in 1985, particularly given the complete turnover of the Board and top executive leadership of the school district by that time. Indeed, the context by 1985 was actually the 13 years of good-faith compliance and implementation of the 1972 desegregation decree which is established by the record.

B. The Board Adopted the SRP for Additional Non–Discriminatory Reasons Related to the Expected Benefits of a Neighborhood Schools Plan

This court concluded above that the SRP was adopted primarily for the legitimate,

non-discriminatory purpose of "avoiding the oppressive realities demographic change cast upon the 'stand-alone' school concept." *See* 677 F.Supp. at 1516. The record clearly establishes as well that the Board also adopted the SRP for the expected educational and community benefits that would result from the reestablishment of neighborhood schools.[72] The advantages of neighborhood schools were recognized by the sixth circuit in *Deal v. Cincinnati Bd. of Educ.*:

> [T]he neighborhood school system.... is acknowledged to have several valuable aspects which are an aid to education, such as minimization of safety hazards to children in reaching school, economy of cost in reducing transportation needs, ease of pupil placement and administration through the use of neutral, easily determined standards, and better home-school communication.

369 F.2d 55, 60 (6th Cir.1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967). The Oklahoma City School Board was motivated to implement the SRP, in part, by these positive aspects of neighborhood schools. This evidence reinforces the court's finding that the Board did not act with discriminatory intent.

### 1. *Parental Involvement*

One of the reasons the Board adopted the SRP was to increase the degree of parental involvement in the Oklahoma City elementary schools. Tr. at 435 (Dr. Muse); Def.Ex. 79. At the time it adopted the SRP, the Board was convinced, and virtually every expert in this case agrees, that parental involvement is essential to academic achievement and a quality education. *See* Tr. at 515, 736, 849, 891, 916, 1066–68, 1455. Dr. Lane testified that "one of the hallmarks of an effective school is parental involvement." Tr. at 897. Dr. Steller testi-

---

**72.** The neighborhood plan, as enacted and revised, had several stated objectives, including (1) maintaining a unitary system; (2) establishing K–4 schools in the predominantly black northeast section where none existed; (3) maintaining K–4 neighborhood schools with stability; (4) increasing pride and parental involvement in the elementary schools; and (5) continuing an integrated school district in an urban setting.

Def.Ex. 96 at 2. The Board expected that the SRP would provide a number of benefits: (1) neighborhood schools; (2) fifth-year centers in all areas, not just the northeast quadrant; (3) reduction of busing; (4) program improvement, including increased participation in extracurricular activities; (5) increased parental participation; and (6) increased community involvement and support. *Id.* at 4.

fied that parental involvement enhances academic achievement. Tr. at 736.

Parental participation in the school system had declined significantly during the operation of the Finger Plan. Tr. at 514–15. In 1969, there were 95 parent-teacher associations (PTA's) in the Oklahoma City School District with a total membership of 26,528. Def.Ex. 140 at 2. By the time the Board adopted the SRP in 1985, the number of PTA units had decreased to 15 and the total membership had dropped to 1,377. *Id.* In the past, the Board and the PTA had attempted to increase the level of pa-

rental involvement by encouraging participation and by instituting a variety of programs. These efforts included attempting to implement a district-wide parents' council, moving School Board meetings to locations within the community, and providing buses to transport parents to PTA meetings. Tr. at 515–16, 594. All of these efforts, however, failed. Tr. at 517–18. This court finds the record on this issue is unequivocal: the Board believed that neighborhood elementary schools would increase parental involvement and instituted the SRP, in part, on that basis.[73]

**73.** Although of limited relevance to the question of the Board's intent as of 1985, *see supra* at 1155, the positive effects of the SRP on parental involvement that actually did occur confirm that the Board's stated intentions in implementing the SRP were valid and not pretextual. In this case, parental involvement did increase under the SRP. After the first year of operation of the reassignment plan, the number of PTA organizations increased by 100% and PTA membership increased by 80%. Def.Ex. 139–40. Following the second year of implementation, the number of PTA organizations increased a total of 200% and PTA membership increased by a total of 144%. *Id.* Moreover, following implementation of the plan, the number of elementary parents attending open house was up 5,167 and 3,745 more parents attended parent/teacher conferences in 1986–87 than in the year preceding the plan. Def.Ex. 140.

While acknowledging a "substantial increase in parent participation" subsequent to the implementation of the SRP, the tenth circuit majority questioned the causal link between the establishment of neighborhood schools and increased parental participation. 890 F.2d at 1531. As an initial matter, this court notes that the effectiveness of the Plan in increasing parental participation is not dispositive of the legitimacy of the Board's intent. This court, nonetheless, finds this causal relationship reaffirmed by a fresh review of the record. A number of witnesses testified based upon personal knowledge that the increased participation of parents was due to the neighborhood plan. *See* Tr. at 339 (Dr. Biscoe indicated that "[a]ll of the data that we currently have indicates that parent involvement has increased significantly" under the operation of the plan); Tr. at 399–400 (Board member Hermes testified that "the biggest reason that we got as many PTA's and PTO's started was because we went back to a neighborhood plan, and the school was available for parents to go in and organize them."); Tr. at 516–20 (Board president Mrs. Hill testified about unsuccessful attempts to increase elementary parent involvement before implementation of the neighborhood plan and her personal observations of increased parental involvement under

the plan. *See* Tr. at 339 (Dr. Biscoe indicated that the return of neighborhood schools parental involvement SRP); Tr. at 583–84 (Dr. Betty Mason, Assistant Superintendent, testified that neighborhood schools increase both parental and community involvement); Tr. at 629–30 (Mr. Owens, a black parent in the northeast quadrant, supported the neighborhood plan; he also noted the increased parental involvement with the plan); Tr. at 736–37 (Dr. Steller, school superintendent, testified that with the return of neighborhood schools parents were much more willing to participate in PTA, parent conferences and open houses); Tr. at 775–76 (Karen Leveridge, former local, state and national officer in PTA, testified that implementation of the neighborhood plan was one of the major reasons responsible for increased PTA participation); Tr. at 790–91 (Odette Scobey, principal of Truman Elementary with 27 years service, testified that parents have become more involved in helping in the classroom and attending parent conferences since the neighborhood plan was implemented); Tr. at 853–55 (Robert Brown, principal of Martin Luther King Elementary, testified that parental involvement and support has increased since the enactment of the neighborhood plan); Tr. at 863 (Billie Oldham, district-wide PTA council president who organized new PTA units, testified that she saw a great increase in parental involvement with the neighborhood plan). Indeed, no witness offered a competing explanation of the increase in parental participation after implementation of the SRP.

Moreover, Defendants' experts agree that neighborhood schools, in general, promote parental participation in the school community. Dr. Lane testified that "a neighborhood school program can insure [sic] greater parental involvement.... Proximity means easy access, and that's very good, and the neighborhood school does help that." Tr. at 897. Dr. Walberg indicated that the neighborhood reassignment plan emphasizes interaction between students, teachers and parents. Tr. at 918–22, 934. The court finds that this testimony is credible and convincing.

The only evidence in the record arguably weighing against the testimony offered by Defendants' witnesses is, at best, ambiguous. *See*

## 2. Community Involvement

Another reason the Board adopted the SRP was to increase the level of community involvement with the Oklahoma City public schools. The Board was convinced that one of the benefits of neighborhood schools would be an increase in community involvement and support. Tr. at 429. Indeed, Mrs. Hill stated this belief to the Board on November 19, 1984, during the committee's presentation of the new reassignment plan. Def.Ex. 79 at 3. Moreover, the court notes that under the SRP, the school system continued to administer an Adopt–A–School program, a cooperative effort of the school district and the Chamber of Commerce under which local businesses and organizations are encouraged to donate time, goods, or services to particular schools in the district. Tr. at 585. The court finds this evidence clearly establishes increased community involvement as a goal of the SRP.[74]

## 3. Programs to Maintain Unitary School System

The evidence further indicates that in adopting the SRP, the School Board intended to retain its commitment to a desegregated school system. See Tr. at 424 (Dr. Muse); Def.Ex. 95 at 1 ("We were declared a unitary school system in 1977, and we desire to remain so.") As part of the SRP, the School Board instituted a number of programs designed to preserve to the maximum extent possible the desegregated nature of the school system—the "majority-to-minority" ("M–to–M") transfer program,

the Student Interaction Plan, the Equity Committee, and an Equity Officer. The court finds the establishment of these programs indicative of the Board's non-discriminatory intent.

As designed and implemented, the SRP continued the M–to–M program instituted under the Finger Plan. Under this program, the parent of any elementary student attending a school where his child's race is in the majority may transfer the child to a school where his race will be in the minority. Shortly after the SRP was adopted, the School District sent letters to all parents informing them of the availability through free, district-provided transportation. The M–to–M transfer option is recognized by the Supreme Court as an appropriate and useful desegregation tool. Swann, 402 U.S. at 26–27, 91 S.Ct. at 1281. Its use, implementation, and availability in the Oklahoma City elementary schools indicates a dedication by the School Board to an integrated school system despite geographical obstacles.[75] As this court stated in 1987, "[p]arents in Oklahoma City today have a choice. No pupil of a racial minority is excluded from any school in Oklahoma City on account of race." 677 F.Supp. at 1523.

On appeal, the tenth circuit majority discounted this court's reliance on the M–to–M program as indicative of non-discriminatory intent, stating that the evidence did not establish the effectiveness of the program. 890 F.2d at 1500–01. The circuit court focused on the success of the program at

Tr. at 1413–14 (Clara Luper, high school teacher and NAACP Youth Adviser, testified that only eight parents attended the Longfellow PTA meeting when she was a guest and that Harrison Elementary had "a very effective PTA," but that it was "mixed in with school activities."); Tr. at 1434 (Senator Porter, Oklahoma City NAACP President, gave hearsay testimony concerning effective functioning of PTA's under the 1972 plan).

**74.** Although again of only marginal relevance to the issue of intent, see supra at 1155, this court notes that community involvement did, in fact, increase under the SRP, circumstantially confirming that this was in fact part of the actual intent behind the SRP. The year before the plan was adopted there were 53 organizations participating in the Adopt–A–School program,

making a total of 111 adoptions, 14 of which were elementary schools. Def.Ex. 142. In contrast, the first year the plan was in operation, there were 369 adopting organizations making a total of 378 adoptions, 137 of which were elementary schools. Id. The second year the plan was in operation, there were 349 organizations, making 522 adoptions, 239 of which were elementary schools. Id. Both Dr. Muse and Dr. Steller testified that this increased community involvement and support was directly related to the adoption of the K–4 neighborhood plan. Tr. at 428–29, 716–19. See also Tr. at 584–86 (Dr. Mason).

**75.** During the 1984–85 school year, a total of 332 parents exercised the option and the following year a total of 181 parents exercised it. Def.Ex. 108.

improving racial balance, rather than on the implications of the program with respect to discriminatory intent. Admittedly, use of the M–to–M program alone may not desegregate schools in the northeast quadrant. *See* Tr. at 609. It does not follow, however, that adoption of the program does not support an inference that the Board acted without discriminatory intent—that the Board adopted the SRP "in spite of" rather than "because of" its likely segregative impact on certain schools in the northeast quadrant. Continuation of the M–to–M program supports the conclusion that, under the SRP, students are *not* excluded from certain schools on the basis of race. This court is fully justified in concluding that retention of the option as part of the SRP is indicative of the School Board's legitimate, non-discriminatory motivation in enacted the SRP.

The tenth circuit majority makes a similar statement with respect to the SRP's Student Interaction Plan. *See* 890 F.2d at 1501. Under this plan, 90%+ black schools are paired with schools that do not have significant black populations. Tr. at 394–95. Teachers in these schools are encouraged to bring the students together several times a year for joint educational activities; for example, those activities might include allowing the students to write letters to each other and send videocassettes of themselves. Tr. at 395; *see* Def.Ex. 102 (Student Interaction Plan Guidelines). The tenth circuit majority's criticism of the effectiveness of this plan does not impugn the motives of the School Board nor does it alter this court's conclusion that the institution of such a program is an indication that the School Board adopted the SRP without discriminatory intent.

The SRP also established an Equity Committee chaired by the Equity Officer to oversee the elementary schools and to assure that facilities and equipment were relatively equal throughout the District. Tr. at 351. The Equity Committee is composed of thirty-two citizens and community leaders chosen to reflect the diverse makeup of the district. Tr. at 352, 831. The Equity Officer is also "responsible for monitoring the implementation of the District's student assignment plan" and making "recommendations that will maintain equity of educational opportunity to all students in all schools," providing reports on these subjects to the School District Superintendent. Def.Ex. 100. The court finds establishment of this program representative of non-discriminatory intent.

### 4. *Educational and Extracurricular Programs*

In adopting the SRP, the Board also sought to improve educational and extracurricular programs at the district's elementary schools. Mrs. Hermes, a member of the committee that proposed the SRP, testified that "the main focus" of the Plan was to "provide an equitable education for all of our students." Tr. at 353. She testified further that it was her belief that "educational achievement would be enhanced by going back to neighborhood schools." Tr. at 390. Moreover, the Board recognized that the SRP would improve programs for all elementary students, especially fifth graders. *See* Tr. at 429 (Dr. Muse) ("[The SRP] provides for an improved program arrangement, particularly with respect to the fifth-year centers, because, with a larger student body, more activities can be offered to all of the fifth-year centers as opposed to, when you have a K–5 stand-alone system, you have a smaller fifth-year grade component, and therefore can't have the kind of activities you could have with more students.")

In a further attempt to increase educational opportunities in the elementary grades, the School Board instituted an "effective schools" program. This program involved creating "a positive teaching-learning environment" by upgrading the instructional effectiveness of teachers and the instructional leadership of administrators and by implementing programs that would enhance learning for all Oklahoma City public school students. Tr. at 918–19. The effective schools approach focuses on increasing academic achievement through a safe and orderly learning environment by setting high expectations for all students and closely monitoring student performance. Tr. at 685–86. The adoption of this

program as part of the SRP again provides evidence that improving educational programs and achievement was indeed one of the Board's motivations in adopting the SRP.[76]

### 5. *Negative Effects of Busing*

The record also establishes that by instituting the SRP, the Board hoped to alleviate the negative effects of forced busing on young children. Under the Finger Plan, children had to get up early to catch buses, many times waiting in the cold and rain to be transported to communities that were completely unfamiliar to them. Tr. at 436. The committee that developed the SRP believed that the adverse impact from compulsory busing was greater on young children in grades one through four than on older children. Tr. at 458–59. Dr. Belinda Biscoe, the senior researcher working with the Board committee, explained her concerns over forced busing of elementary children:

Q. Is it your opinion that the K–4 students are too young to be bussed from school to school?

A. I think they are.

Q. And will you tell the Court why?

A. Kids six—from six years old until they're about eight years old, I think, are just beginning to make sound judgments. Having to walk to bus stops and then to go to parts of towns that their parents don't have access to, necessarily, during the day if they get ill, I think it just creates a stress on the family and the child.

By the time a child is ten years old, they're better able to make decisions in terms of steering clear of strangers, paying attention to street crossings, and those kinds of things, and I do believe they're just safer at that point in terms of having to be bussed.

Tr. at 338–39. Moreover, parents, both white and black, had approached the Board requesting the elimination of some busing in an effort to keep their children closer to home. Tr. at 526.[77]

### C. The Emergence of Predominantly Black Schools Under the SRP, Without More, Does Not Establish that the Board Acted with Discriminatory Intent

As the record in this case clearly shows, throughout the eight days in 1987 that the court heard testimony, Plaintiffs presented no evidence which directly challenged the Board's stated motives in adopting the SRP. Rather, Plaintiffs' claim of discriminatory intent depends entirely on the emergence of ten predominantly black schools under the SRP due to the residential segregation in parts of Oklahoma City.

---

**76.** Although again of only marginal relevance, providing circumstantial evidence that the stated intention was a reasonable belief to hold, *see supra* at 1155, this court notes that the increased level of parental involvement which came with neighborhood schools, coupled with the Board's "effective schools" program, did indeed result in substantial overall academic improvement in many of the predominantly black elementary schools. In 1986–87, eight of the ten elementary schools with 90%+ black enrollments had achievement test gains which surpassed the national average for black students. Def.Ex. 185 at 5. Moreover, between 1985–86 and 1986–87, the gap between third grade black and white student achievement scores was reduced by 13%. Def.Ex. 185 at 4. Mrs. Hermes testified that the district's neighborhood schools and "effective schools" program were responsible for narrowing that gap. Tr. at 402. Even Plaintiffs' expert, Dr. Crain, admitted that this 13% reduction could be attributed to the "effective schools" program and the increase in parental involvement that resulted from the implementation of neighborhood schools. Tr. at 1084–85.

On appeal, the tenth circuit majority challenged Defendant's evidence of increased black achievement under the SRP and the success of the "effective schools" program. 890 F.2d at 1501. Aside from the fact that this court finds the majority's criticisms unfounded, the success of the Board's efforts to enhance student achievement again has only tangential bearing on the Board's intent in 1985 when the SRP was implemented.

**77.** Plaintiffs' expert, Dr. Crain, questioned as highly suspect Defendants' evidence that busing had a harmful effect on student achievement and emotional development. Tr. at 1007–08. Whether Dr. Crain is correct or not is irrelevant to the question of intent, however. This court concludes, and Plaintiffs do not attempt to dispute, that at the time the SRP was adopted, the Board believed that busing young children was harmful and consequently adopted a neighborhood school plan.

This court's 1987 determination that the Board did not adopt the SRP with discriminatory intent "sharply focused on the racial composition of the predominantly black schools which came into being as a result of the neighborhood plan." 677 F.Supp. at 1517. This court has now, once again, "sharply focused" on the predominantly black schools created by the SRP, and concludes, yet again, that the Board's adoption of the SRP was free of discriminatory intent.[78]

The Supreme Court has held unequivocally that discriminatory intent may not be inferred solely from the disproportionate impact of a particular measure upon one race. *Arlington Heights*, 429 U.S. at 264–65, 97 S.Ct. at 562–63. Thus, "[a] neighborhood school policy in itself does not offend the Fourteenth Amendment." *Crawford v. Los Angeles Bd. of Educ.*, 458 U.S. 527, 537 n. 15, 102 S.Ct. 3211, 3217 n. 15, 73 L.Ed.2d 948 (1982).[79] The Supreme Court recognizes that a school board is free to adopt a neighborhood school plan so long as it does not act with discriminatory intent. Here, the court finds no such intent. Valid educational concerns formed the basis for the Board's decision to adopt the SRP.

The tenth circuit majority opinion concluded that 32 out of 64, or one-half, of the elementary schools are now "one-race majority schools." 890 F.2d at 1493, 1502. As Judge Baldock explained in his dissent, however, the majority's analysis was flawed. The majority correctly noted that 11 out of 64 elementary schools were 90%+ black after the plan.[80] But one of those, Parker, was 90%+ black before adoption of the SRP because it was excluded from busing under the Finger Plan due

---

**78.** *Spangler* undercuts the argument that the emergence of 90%+ black schools under the SRP is an indication of discriminatory intent. In that case, 5 out of 32 schools had majority black student enrollment just four years after the 1970 decree implementing the desegregation plan. 427 U.S. at 431, 96 S.Ct. at 2702. The Supreme Court determined that readjustment of the desegregation plan was not necessary because demographic changes, rather than the school board, were responsible for creating this situation. In the present case, the Oklahoma City School Board is not responsible for creating the residential segregation causing the predominantly black schools under the SRP. *See supra* at 1166–71.

**79.** *See also Milliken v. Bradley*, 433 U.S. 267, 280 n. 14, 97 S.Ct. 2749, 2757 n. 14, 53 L.Ed.2d 745

**80.**

(1977) (The United States Supreme Court "has consistently held that the Constitution is not violated by racial imbalance in the schools, without more."); *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 531 n. 5, 99 S.Ct. 2971, 2976 n. 5, 61 L.Ed.2d 720, *reh'g denied*, 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979) (Mere "[r]acial imbalance ... is not *per se* a constitutional violation."); *Washington v. Davis*, 426 U.S. at 240, 96 S.Ct. at 2048 (the existence of both "predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause."); *Swann*, 402 U.S. at 26, 91 S.Ct. at 1281 (The existence of some one-race schools within a district "is not in and of itself the mark of a system that still practices segregation by law.").

### 90 + Black Elementary Schools

| School | Black | Other | Total | % Black |
|---|---|---|---|---|
| Creston Hills | 219 | 2 | 221 | 99.0 |
| Dewey | 248 | 4 | 252 | 98.4 |
| Edwards | 218 | 1 | 219 | 99.5 |
| Garden Oaks | 181 | 3 | 184 | 98.3 |
| King | 278 | 3 | 281 | 98.9 |
| Lincoln | 287 | 2 | 289 | 99.3 |
| Longfellow | 230 | 2 | 232 | 99.1 |
| North Highland | 315 | 8 | 323 | 97.1 |
| Parker | 347 | 11 | 358 | 96.9 |
| Polk | 262 | 3 | 265 | 98.8 |
| Truman | 369 | 1 | 370 | 99.7 |
| Total | 2,954 | 40 | 2,994 | 98.7 |

Pl.Ex. 27.

to its remote location in the Star–Spencer area. Tr. at 212, 343; 338 F.Supp. at 1268. In addition, Lincoln and Truman have been closed, but Dunbar has reopened as a predominantly black school, leaving a net total of 9 additional 90%+ black schools resulting from the SRP. Def.Ex. 65; Tr. at 730–34.

The panel majority declared an additional 21 schools racially disproportionate, deciding that a school is not racially mixed if it has less than 10.7% black enrollment, regardless of the percentage of other minorities. 890 F.2d at 1487 n. 2.[81] This calculation fails to recognize the presence of non-black minorities in the Oklahoma City

**81.**

Membership by School Race
K–4 Elementary Schools
Includes K–4 portion of K–5 Elementary Schools
1986–87

| School | Black | Other | Total | % Black |
|--------|-------|-------|-------|---------|
| Adams | 23 | 354 | 377 | 6.1 |
| Arthur | 23 | 291 | 314 | 7.3 |
| Bodine | 199 | 382 | 581 | 34.2 |
| Britton | 118 | 193 | 311 | 37.9 |
| Columbus | 63 | 349 | 412 | 15.2 |
| Coolidge | 23 | 420 | 443 | 5.1 |
| Creston Hills | 219 | 2 | 221 | 99.0 |
| Davis | 16 | 145 | 161 | 9.9 |
| Dewey | 248 | 4 | 252 | 98.4 |
| Edgemere | 154 | 146 | 300 | 51.3 |
| Edwards | 218 | 1 | 219 | 99.5 |
| Eugene Field | 150 | 321 | 471 | 31.8 |
| Fillmore | 17 | 246 | 263 | 6.4 |
| Garden Oaks | 181 | 2 | 184 | 98.3 |
| Gatewood | 68 | 196 | 264 | 25.7 |
| Harrison | 83 | 85 | 168 | 49.4 |
| Hawthorne | 64 | 269 | 333 | 19.2 |
| Hayes | 37 | 292 | 329 | 11.2 |
| Heronville | 31 | 314 | 345 | 8.9 |
| Hillcrest | 32 | 243 | 275 | 11.6 |
| Horace Mann | 67 | 123 | 190 | 35.2 |
| Kaiser | 38 | 171 | 209 | 18.1 |
| King | 278 | 3 | 281 | 98.9 |
| Lafayette | 6 | 212 | 218 | 2.7 |
| Lee | 22 | 309 | 331 | 6.6 |
| Lincoln | 287 | 2 | 289 | 99.3 |
| Linwood | 32 | 202 | 234 | 13.6 |
| Longfellow | 230 | 2 | 232 | 99.1 |
| Madison | 30 | 170 | 200 | 15.0 |
| Mark Twain | 12 | 111 | 123 | 9.7 |
| North Highland | 315 | 8 | 323 | 97.5 |
| Oakridge | 125 | 170 | 295 | 42.3 |
| Parker | 347 | 11 | 358 | 96.9 |
| Parmelee | 41 | 305 | 346 | 11.8 |
| Pierce | 36 | 184 | 220 | 16.3 |
| Polk | 262 | 3 | 265 | 98.8 |
| Prairie Queen | 24 | 362 | 386 | 6.2 |
| Putnam Heights | 105 | 196 | 301 | 34.8 |
| Quail Creek | 31 | 204 | 235 | 13.1 |
| Ridgeview | 51 | 247 | 298 | 17.1 |
| Rockwood | 176 | 248 | 424 | 41.5 |
| Sequoyah | 58 | 238 | 296 | 19.5 |
| Shidler | 95 | 161 | 256 | 37.1 |
| Shields Heights | 16 | 385 | 401 | 3.9 |
| Southern Hills | 16 | 210 | 226 | 7.0 |
| Spencer | 264 | 82 | 346 | 76.3 |
| Stand Watie | 91 | 260 | 351 | 25.9 |
| Star | 212 | 133 | 345 | 61.4 |

school system. In 1985–86, blacks comprised 36.0% of the elementary system enrollment and non-black minorities comprised 13.3% (Hispanic, 6.8%; Native American, 4.2%; Asian–American, 2.3%) of the student body. Def. Ex. 63.

Comparing the white enrollment with the aggregated number of minority students,

as is appropriate under *Keyes*, 413 U.S. at 197–98, 93 S.Ct. at 2691–92, and as this court did in 1987, shows that the 21 extra schools identified by the tenth circuit majority range from 13.8% (Lafayette) to 58.5% (Willard) minority enrollment. *See* 890 F.2d at 1512 (Baldock, J., dissenting).[82] This court agrees with Judge Baldock that

| School | Black | Other | Total | % Black |
|---|---|---|---|---|
| Stonegate | 170 | 343 | 513 | 33.1 |
| Truman | 369 | 1 | 370 | 99.7 |
| Van Buren | 15 | 178 | 193 | 7.7 |
| West Nichols Hills | 63 | 251 | 314 | 20.0 |
| Western Village | 208 | 109 | 317 | 65.6 |
| Westwood | 40 | 160 | 200 | 20.0 |
| Wheeler | 25 | 280 | 305 | 8.1 |
| Willard | 13 | 129 | 142 | 9.1 |
| Willow Brook | 200 | 188 | 388 | 51.5 |
| Wilson | 50 | 139 | 189 | 26.4 |
| Subtotal | 6,387 | 10,746 | 17,133 | 37.3 |
| Arcadia | 22 | 55 | 77 | 28.5 |
| Buchanan | 20 | 205 | 225 | 8.8 |
| Johnson | 51 | 137 | 188 | 27.1 |
| Monroe | 42 | 223 | 265 | 15.8 |
| Rancho Village | 18 | 151 | 169 | 10.6 |
| Telstar | 199 | 134 | 333 | 59.7 |
| Total | 6,739 | 11,651 | 18,300 | 36.6 |

Pl.Ex. 27.

**82.**

K–4 Elementary Schools
Membership by School
1985–86

| School | % White | % Black | % Minority* |
|---|---|---|---|
| Lafayette | 86.2 | 2.0 | 13.8 |
| Shields Heights | 66.9 | 4.0 | 33.1 |
| Hillcrest | 84.5 | 5.1 | 15.5 |
| Arthur | 79.8 | 5.7 | 20.2 |
| Rancho Village | 83.8 | 5.8 | 16.2 |
| Prairie Queen | 84.7 | 6.2 | 15.3 |
| Parmelee | 79.0 | 6.3 | 21.0 |
| Davis | 65.1 | 6.6 | 34.9 |
| Willard | 41.5 | 6.6 | 58.5 |
| Coolidge | 81.1 | 7.3 | 18.9 |
| Buchanan | 80.0 | 7.5 | 20.0 |
| Lee | 55.5 | 7.7 | 44.5 |
| Southern Hills | 79.0 | 8.0 | 21.0 |
| Van Buren | 75.7 | 8.4 | 24.3 |
| Adams | 80.0 | 8.5 | 20.0 |
| Fillmore | 80.8 | 8.7 | 19.2 |
| Linwood | 85.1 | 9.2 | 14.9 |
| Wheeler | 61.7 | 10.0 | 38.3 |
| Madison | 78.0 | 10.5 | 22.0 |
| Hayes | 81.0 | 10.7 | 19.0 |
| Mark Twain | 67.9 | 10.7 | 32.1 |

* Includes Black, Hispanic, Native–American and Asian–American

Def.Ex. 63. None of these twenty-one schools is a one-race white school. Although these schools contain less than the system-wide average of black students, 38.5%, Pl.Ex. 26, and less than the system-

these 21 schools are not one-race schools, even if they do not contain the system-wide average of black students. Indeed, some of these schools approach the elementary system-wide minority percentage. *See, e.g.,* Lee (44.5%) and Willard (58.5%).

Insofar as the permissible inference of segregative intent in concerned, this court is convinced that the 21 schools identified by the tenth circuit simply do not have the same implications as the eleven 90%+ black schools. Dr. Biscoe, school administrator, testified concerning the importance of total minority percentages, not just black, when evaluating the school district:

> Of course[,] if you look at our district in terms of *total* minority population as compared to white population, you get a totally different picture than if you just look at those data black-white.

Tr. at 321.

Moreover, this court finds it significant that while the SRP resulted in some schools which were 90% or more black, the plan created no schools that were 90% or more white. Tr. at 302. In contrast, prior to the Finger Plan, the district maintained a substantial number of 90% or greater white schools. This court finds that under the SRP, the majority of elementary schools in Oklahoma City are racially mixed.

Even assuming that the tenth circuit majority was correct in its analysis of the number of racially identifiable schools, this court still would not find segregative intent. As the record clearly establishes, the Board did not adopt the SRP in order to bring about one race schools, but rather in spite of such a result. As the Supreme Court has unequivocally stated, an awareness of consequences does not amount to proof of a discriminatory intent. *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296. The Board believed that any adverse effect upon the racial composition of the district elementary schools would be far outweighed by the educational benefits resulting from the SRP. Under such circum-

stances, this court can find no improper intent.

One of the tasks of a federal court is to guard against intentional segregation of the races in public education. Judicial involvement in a unitary school system is warranted only upon a finding of discriminatory intent. It is not the role of this court to second-guess the decisions made by a school district in compliance with constitutional principles. Based upon the foregoing findings and conclusions, this court concludes that the evidence clearly establishes that in adopting the SRP, the Oklahoma City Board of Education did not act with the intent to discriminate against racial minorities in violation of the Equal Protection Clause of the Constitution.

## IV. CONCLUSION

 In reaffirming its previous findings of unitary status and upholding the SRP, this court is mindful of the words of Justice Powell concerning the importance of allowing communities to focus their energies and resources on quality education rather than on legal disputes over forced busing:

> It is well to remember that the course we are running is a long one and the goal sought in the end—so often overlooked—is the best possible educational opportunity for all children. Communities deserve the freedom and the incentive to turn their attention and energies to this goal of quality education, free from protracted and debilitating battles over court-ordered student transportation.

*Keyes,* 413 U.S. at 253, 93 S.Ct. at 2719 (Powell, J. concurring in part, dissenting in part). Where, as here, the School District has already operated a unitary system, implementation of a neighborhood school program with its anticipated benefits of enhanced parental and community involvement and improved educational opportunities for all children is consistent with equal protection principles.

wide average of K–4 black elementary students, 36.04%, id., there is no requirement that "every school in every community must always reflect the racial composition of the school system as a whole." Swann, 402 U.S. at 24, 91 S.Ct. at 1280.

The long history of this case demonstrates the federal courts' proper sensitivity to the need to protect the civil rights of every child in this land. This court will remain ever vigilant in the protection of those rights. The background of this case reflects the great progress that has been made over the years in the vindication of these rights for the black children of Oklahoma City, from the repeal of palpably unconstitutional and disgraceful legal mandates and official policies, to the enactment of new legal protections, and the long, arduous, step-by-step dismantling of the dual school system. It is time to recognize that progress. While the history of discrimination in Oklahoma City cannot be ignored, it "cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden,* 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980) (plurality opinion).

## V. SUMMARY OF FINDINGS

The court has consequently fulfilled the mandate set out by the Supreme Court for this remand. On the basis of the record in the 1987 hearings, the court makes the following findings:

1. The Board complied in good faith with the 1972 desegregation decree from the time it was entered until the adoption of the SRP in 1985;

2. There is no indication that the Board will return to a system of *de jure* segregation in the future;

3. The vestiges of past discrimination had been eliminated to the extent practicable as of 1985, including those relating to:
 a. residential segregation,
 b. student assignments,
 c. faculty,
 d. administrative staff,
 e. transportation,
 f. extracurricular activities, and
 g. facilities;

4. Accordingly, the Board was entitled to complete dissolution of the 1972 decree as of 1985;

5. Further, the SRP was adopted for legitimate, nondiscriminatory reasons without any sign of discriminatory intent;

6. The SRP is, therefore, in compliance with applicable Equal Protection principles and was within the Board's authority to adopt.

Based upon this Memorandum Opinion, an appropriate Order, Judgment and Decree will accordingly be entered.

## ORDER, JUDGMENT AND DECREE

Pursuant to the court's Memorandum Opinion entered herein this day, it is hereby ORDERED, ADJUDGED AND DECREED that:

1. The 1972 desegregation order and decree implementing the Finger Plan is DISSOLVED totally and completely;

2. Total supervision and control over the functions of the school district are RETURNED forthwith to the duly elected members of the Board of Education of the Oklahoma City Public Schools;

3. This court's jurisdiction over this case is TERMINATED, and this action is DISMISSED.

4. This court has fully completed its equitable duties under the law and evidence in this case. Accordingly, the court DIRECTS the court clerk to refrain from filing any further applications to reopen this case without the court's prior approval.

5. Of course, the courthouse doors are always open to protect and guard the constitutional rights of black schoolchildren against any kind of state or local school district-sponsored racial discrimination.